IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

West Virginia Citizens Defense League, Inc.,
   *et al.*,

             Plaintiffs,

                 v.

City of Charleston, *et al.*,

             Defendants

Civil Action No.: 2:11-cv-48

(Copenhaver, J.)

## PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE AND OPPOSITION TO SOUTH CHARLESTON DEFENDANTS' FIRST MOTION TO DISMISS

Plaintiffs, by and through their undersigned counsel, respectfully submit the following in response and opposition to the South Charleston Defendants' pre-answer motion to dismiss. Dkt. 21.

## I. INTRODUCTION

On January 24, 2011, Plaintiffs filed the instant action.  On March 16, 2011, Plaintiffs filed their First Amended Complaint. Dkt. 13. On March 22, 2011, by stipulation of the parties, Dkt. 15, this court extended the time for the "South Charleston Defendants" and the "Dunbar Defendants" to file their answers or Rule 12 motions to April 15, 2011. On April 15, 2011, the South Charleston Defendants filed a pre-answer motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6), Dkt. 21, alleging lack of standing by Plaintiffs and failure to state a claim upon which relief may be granted and a memorandum of law in support of said motion, Dkt. 22.  For the reasons stated herein, Plaintiffs respectfully requests that this Honorable Court deny the South Charleston Defendants' Pre-Answer Motion to Dismiss or, in the alternative, grant

1

Plaintiffs leave to file an amended Complaint in light of any deficiencies this Honorable Court may identify.

## II. PLAINTIFFS HAVE STANDING TO SUE.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The South Charleston Defendants' contention that this Honorable Court is without jurisdiction to hear Plaintiffs' challenge to South Charleston City Code § 545.15 because no individual plaintiff or other member of West Virginia Citizens Defense League, Inc. (hereinafter "WVCDL"), has been identified as under an immediate, actual threat of criminal prosecution, is contrary to recent Supreme Court precedent. Although there must be some minimal threat of adverse action before an allegedly threatened party gains standing to sue,

> where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) (8-1 decision). With the exception of *Montana Shooting Sports Ass'n v. Holder*, 2010 WL 3926029 (D. Mont. Aug. 31, 2010)*,* the cases cited by the South Charleston Defendants supporting a more restrictive standard for standing predate and are superseded by *MedImmune*, which is controlling in this case.

In this case, the South Charleston Defendants are mounting only a "facial attack"—as opposed to a "factual attack"—on the Complaint's allegations regarding whether any individual plaintiff or other identified WVCDL member would otherwise have standing to sue as individuals under *Thigpen v. United States*, 800 F.2d 393 (4th Cir. 1986). *See also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). As this Court has recently explained:

> Generally, challenges to jurisdiction under Rule 12(b)(1) may be raised in two distinct ways: "facial attacks" and "factual attacks." *Thigpen*[], 800 F.2d [at] 401 n. 15[]. A "facial attack" questions whether the allegations in the complaint are sufficient to sustain the court's jurisdiction. *Id.* If a "facial attack" is made, the court must accept the allegations in the complaint as true and decide if the complaint is sufficient to confer subject matter jurisdiction. *Id.*
>
> On the other hand, a "factual attack" challenges the truthfulness of the factual allegations in the complaint upon which subject matter jurisdiction is based. In this situation, a "district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."

*Ohio Valley Environmental Coalition, Inc. v. Apogee Coal Co., LLC*, 531 F.Supp.2d 747, 764 (S.D. W.Va. 2008) (internal citations and footnote omitted) ("OVEC I").  In deciding Rule 12(b)(1) motion, a court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (internal quotation marks and citation omitted).

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (*quoting Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)) (quotation marks and alteration in original).  A plaintiff's standing does not depends not upon the merits, *see Warth*, 422 U.S. at 500, but on "whether the plaintiff is the proper party to bring [the] suit." *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *see also Libertad v. Welch*, 53 F.3d 428, 437 n.5 (1st Cir. 1995) ("An analysis of a plaintiff's standing focuses not on the claim itself, but on the party bringing the challenge; whether a plaintiff's complaint could survive on its merits is irrelevant to the standing inquiry."). If a plaintiff's legally-protected interest hinged on whether a given claim could succeed on the merits, then "every unsuccessful plaintiff will have lacked standing in the first place." *Claybrook v. Slater*, 111 F.3d 904, 907 (D.C. Cir. 1997).

It is well-settled that an individual has standing to sue if (1) the person has suffered an actual or threatened injury that is not conjectural or hypothetical, (2) the injury is fairly traceable to the challenged conduct; and (3) a favorable decision is likely to redress the injury. *Defenders of Wildlife*, 504 U.S. at 560-61; *Allen v. Wrigh*t, 468 U.S. 737, 751 (1984).

Jereomy Schulz is a resident of Kanawha County, West Virginia, and is a member of WVCDL.  Declaration of Jereomy Schulz ("Schulz Dec.") ¶¶ 2, 4. Mr. Schulz has a West Virginia concealed handgun license and usually carries a handgun except when and where prohibited by law. *Id.* at ¶¶ 8, 10. Mr. Schulz is deprived of his right to keep and bear arms every time he enters a South Charleston city-owned building, park, or recreation area.  *Id.* at ¶¶ 20-23. Mr. Schulz's desire to engage in conduct prohibited by South Charleston City Code § 545.15 is far from speculative. "But for the ongoing threatened enforcement of . . . South Charleston City Code § 545.15, . . . I would regularly carry handguns when I visit various locations described in . . . South Charleston City Code § 545.15 . . . ." Schulz Dec. at ¶ 23. "The loss of Second Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (citation and footnote omitted).

> Given *Heller's* focus on "core" Second Amendment conduct and the Court's frequent references to First Amendment doctrine, we agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment.

*U.S. v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010).

In *Mobil Oil Corp. v. Attorney General of Virginia*, 940 F.2d 73, 76 (4th Cir. 1991), the court clearly rejected the extreme interpretation of its earlier decision in *Doe v. Duling*, 782 F.2d 1202 (4th Cir. 1986), now asserted by the South Charleston Defendants.  *Duling* involved a

"challenge[] on privacy grounds [to] a nineteenth century fornication statute which had not been enforced in private homes for years, if not decades." *Mobil Oil*, 940 F.2d at 76 (*quoting American Booksellers Ass'n, Inc. v. Virginia*, 802 F.2d 691, 694 n. 4 (4th Cir. 1986)).  South Charleston City Code § 545.15 was enacted in 1994. Here, as in *American Booksellers* and *Mobil Oil*, we are dealing with a recently-enacted law, not some anachronistic throwback to a prior century that was being openly violated en masse without any enforcement action of any kind. Like Mobil Oil, Plaintiffs have "alleged 'an actual and well-founded fear' that the law will be enforced, and ha[ve] in fact 'self-censored' [themselves] by complying with the statute, incurring harm all the while." *Mobil Oil*, 940 F.2d at 76.

Plaintiffs simply are not "required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton*, 410 U.S. 179, 188 (1973). As the Supreme Court more recently and clearly explained:

> where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.

*MedImmune*, 549 U.S. at 128-29. *MedImmune* is particularly important not only for its recency and clarity regarding pre-enforcement challenges to government actions, but the fact that significantly broadened the federal courts' jurisdiction to hear declaratory judgment actions between purely private actors who sought to test their legal rights before actually taking actions that might affect their respective legal rights and obligations.

Per the advice of the 4th Circuit in *Mobil Oil* and the Supreme Court in *MedImmune*, Plaintiffs "prefer 'official adjudication to public disobedience.'" *National Rifle Ass'n v. Magaw*,

132 F.3d 272, 287 (6th Cir. 1997)  (*quoting* 13A, Charles A. Wright, Arthur R. Miller & Edward

H. Cooper, *Federal Practice and Procedure*, § 3532.5, at 183-84 (2d ed. 1984)).

> Public policy should encourage a person aggrieved by laws he considers
> unconstitutional to seek a declaratory judgment against the arm of the state
> entrusted with the state's enforcement power, all the while complying with the
> challenged law, rather than to deliberately break the law and take his chances in
> the ensuing suit or prosecution.

*Mobil Oil*, 940 F.2d at 75. A challenge to a firearms prohibition is justiciable where "the

plaintiffs wish to engage in conduct plainly prohibited on the face of the allegedly

unconstitutional statute." *Coalition of New Jersey Sportsmen v. Whitman*, 44 F.Supp.2d 666, 673

n.10 (D. N.J. 1999), *aff'd*, 263 F.3d 157 (3d Cir.) (mem.), *cert. denied*, 534 U.S. 1039 (2001).

Although it could be argued that no individual plaintiff suffers a legally-cognizable injury

once he or she leaves a South Charleston city building, park or recreation area and is no longer

subject to the challenged ordinance, repetitive injuries do not evade judicial review. *See, e.g.,*

*Roe v. Wade*, 410 U.S. 113, 125 (1973); *Bolton*, 410 U.S. at 187-88.

There is no reason to dispute that Plaintiffs' injuries in this action are fairly traceable to

the challenged conduct, as the South Charleston Defendants' threatened enforcement of South

Charleston City Code § 545.15 is the entire basis of this action.  Nothing in this action is based

upon "the independent action of some third party not before the court." *Defenders of Wildlife*,

504 U.S. at 560-61 (*quoting Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-

42 (1976)).

It is "likely, as opposed to merely speculative, that the injury will be redressed by a

favorable decision[,]" *id.* (*quoting Simon*, 426 U.S. at 38, 43) (internal citation and quotation

marks omitted), because an injunction against the challenged ordinance will relieve all Plaintiffs

from the burdens of the ordinance. Conversely, if this Honorable Court sees fit to deny injunctive

relief but instead grants a declaratory judgment declaring the challenged ordinance

6

unconstitutional or void under state law, such relief would also redress Plaintiffs' injury because the judgment would clearly signal to the Defendants and the local courts that the ordinance is unenforceable.

WVCDL is a plaintiff in this action on behalf of its members under its "associational standing," under which

> An association has standing to sue on behalf of its members when: (1) at least one of its members would have individual standing to sue in his or her own right, (2) the interests the organization seeks to protect are germane to its purpose, and (3) there is no need for the direct participation of individual members in the action.

*Ohio Valley Envtl. Coalition, Inc. v. Hobet Mining, LLC*, 702 F. Supp. 2d 644, 649 (S.D. W. Va. 2010) ("OVEC II"); *see also Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (citations omitted).

In their pending motion to dismiss, the South Charleston Defendants seriously contest only whether WVCDL has alleged that its members meet the first element of associational standing—whether "its members would have individual standing to sue in his or her own right[.]" *OVEC II*, 702 F. Supp. 2d at 649. The South Charleston Defendants do not attack the truthfulness of the factual statements in the complaint.  The South Charleston Defendants do not dispute that "the interests [WVCDL] seeks to protect are germane to its purpose," *OVEC II*, 702 F. Supp. 2d at 649, nor do they advance any argument that "there is [a] need for the direct participation of individual [WVCDL] members in the action." *Id.*

At this time, this Court need not address whether the other plaintiffs have standing to sue. In cases where plaintiffs seek injunctive and declaratory relief, so long as "at least one individual plaintiff . . . has demonstrated standing," a court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n. 9 (1977); *see also Watt v. Energy Action Educ.*

*Found.*, 454 U.S. 151, 160 (1981). Only if one or more plaintiffs "obtains relief different from that sought by [Mr. Schulz and WVCDL (through its associational standing on behalf of Mr. Schulz),] whose standing has not been questioned," must this Court address the other plaintiffs' standing to bring suit. *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 402 n.22 (1982).

### III. PLAINTIFFS HAVE STATED CLAIMS UPON WHICH RELIEF CAN BE GRANTED.

Counts 37 through 39 of Plaintiffs' First Amended Complaint allege claims upon which relief can be granted by this Honorable Court. "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks, alterations, and citation omitted). When ruling on a Rule 12(b)(6) motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning the court could draw "the reasonable inference that the defendant is liable for the conduct alleged." *Ashcroft v. Iqbal*, 556 U.S. ___, ___, 129 S.Ct. 1937, 1949 (2009). The purpose of the pleading requirements is threefold: first, "early disposition of inappropriate complaints"; second, "provid[ing] criteria for defining issues for trial"; and third, which is most significant to the present case, assuring the defendants have received "adequate notice of the nature of a claim being made against [them]." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).

### A. South Charleston City Code § 545.15 is unauthorized and void as a matter of state law.

South Charleston City Code § 545.15 is void as a matter of state law because it is not specifically and expressly authorized by statute. While West Virginia law provided South Charleston a power to regulate or prohibit the carrying of weapons on its property at the time the challenged ordinance was adopted, *see* W.Va. Code § 61-7-14 (1989), South Charleston City Code § 545.15 is not strictly compliant with the authorizing statute.

> Notwithstanding the provisions of this article, any owner, lessee or other person charged with the care, custody and control of real property may prohibit the carrying openly or concealing of any firearm or deadly weapon on property under his or her domain: *Provided*, That for purposes of this section "person" means an individual or any entity which may acquire title to real property.

> Any person carrying or possessing a firearm or other deadly weapon on the property of another who refuses to temporarily relinquish possession of such firearm or other deadly weapon, upon being requested to do so, or to leave such premises, while in possession of such firearm or other deadly weapon, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not more than one thousand dollars or confined in the county jail not more than six months, or both: *Provided*, That the provisions of this section shall not apply to those persons set forth in subsections (3) through (6), section six of this [article] while such persons are acting in an official capacity . . . .

W.Va. Code § 61-7-14 (1989).  The critical flaw in South Charleston City Code § 545.15 is that the ordinance makes it unlawful per se to enter any city building, park or recreation area while carrying a handgun.  In order for the South Charleston Defendants to fall under the authorization of W.Va. Code § 61-7-14, they would have to maintain an ordinance and policies, practices, and procedures that require some additional notice and demand to leave or disarm before they could enforce a prohibition against carrying a handgun in a city building, park or recreation area.  Moreover, such an ordinance and policies, practices, and procedures would have to conform to the need to avoid being unconstitutionally vague. *See generally, West Virginia Citizens Defense League v. City of Martinsburg et al.*, Civil Action No. 3:11-cv-5-JPB (N.D. W.Va. filed Jan. 24, 2011).

In addition to the powers and authority granted by: (i) The constitution of this state; (ii) other provisions of this chapter; (iii) other general law; and (iv) any charter, and to the extent not inconsistent or in conflict with any of the foregoing except special legislative charters, every municipality and the governing body thereof shall have plenary power and authority therein by ordinance or resolution, as the case may require, and by appropriate action based thereon:

\* \* \*

(13) To prevent injury or annoyance to the public or individuals from anything dangerous, offensive or unwholesome;

\* \* \*

(36) To establish, construct, acquire, maintain and operate public buildings, municipal buildings or city halls, auditoriums, arenas, jails, juvenile detention centers or homes, motor vehicle parking lots or any other public works;

(37) To establish, construct, acquire, provide, equip, maintain and operate recreational parks, playgrounds and other recreational facilities for public use and in this connection also to proceed in accordance with the provisions of article two, chapter ten of this code;

(38) To establish, construct, acquire, maintain and operate a public library or museum or both for public use;

(39) To provide for the appointment and financial support of a library board in accordance with the provisions of article one, chapter ten of this code;

\* \* \*

(44) To protect and promote the public morals, safety, health, welfare and good order;

\* \* \*

(49) To establish, construct, require, maintain and operate such instrumentalities, other than free public schools, for the instruction, enlightenment, improvement, entertainment, recreation and welfare of the municipality's inhabitants as the governing body may consider necessary or appropriate for the public interest[.]

W.Va. Code § 8-12-5.  Nowhere in any of these provisions is there any mention of authority for a municipality to regulate or prohibit the otherwise lawful carrying of firearms on municipal public property.  Plaintiffs separately address W.Va. Code § 8-12-5(16) below.

Notwithstanding the South Charleston Defendants' argument that they have implicit statutory authority under W.Va. Code § 8-12-5(13), (36)-(39), (44) or (49) to enact and enforce South Charleston City Code § 545.15 in its current form, the West Virginia Supreme Court of Appeals has long recognized that municipalities derive their power from the Legislature and are subject to its strict control of their actions. The court has also long construed municipal powers with the most exacting scrutiny under which it maintains a strong presumption against the recognition of any power claimed by a municipality, which the municipality bears a heavy burden to overcome.

"A municipal corporation possesses no inherent police power. It has only such regulatory authority as has been expressly or impliedly delegated to it by the Legislature." Syllabus Point 1, *State ex rel. Kelley v. City of Grafton*, 87 W.Va. 191, 104 S.E. 487 (1920).

> A municipal corporation has only the powers granted to it by the legislature, and any such power it possesses must be expressly granted or necessarily or fairly implied or essential and indispensable. If ***any*** reasonable doubt exists as to whether a municipal corporation has a power, the power ***must*** be denied.

Syllabus Point 2, *State ex rel. City of Charleston v. Hutchinson*, 154 W.Va. 585, 176 S.E.2d 691 (1970) (emphasis added).

> Municipalities are but political subdivisions of the state, created by the Legislature for purposes of governmental convenience, deriving not only some, but all, of their powers from the Legislature. They are mere creatures of the Legislature, exercising certain delegated governmental functions which the Legislature may revoke at will. In fact, public policy forbids the irrevocable dedication of governmental powers. The power to create implies the power to destroy.

*Booten v. Pinson*, 77 W.Va. 412, 421, 89 S.E. 985, 989 (1915). In other words,

> [m]unicipalities are creatures of the State who draw their powers from the law which creates them; therefore, if a [municipal ordinance] conflicts with either our Constitution or our general laws, the [ordinance], being the inferior law, must fail.

*Marra v. Zink*, 163 W.Va. 400, 404, 256 S.E.2d 581, 584 (1979) (citation omitted).

> A municipal corporation is a creature of the State, and can only perform such functions of government as may have been conferred by the Constitution, or delegated to it by the law-making authority of the State. It has no inherent powers, and only such implied powers as are necessary to carry into effect those expressly granted.

Syllabus Point 1, *Brackman's Inc., v. City of Huntington*, 126 W.Va. 21, 27 S.E.2d 71 (1943).

> Municipalities have no inherent power with regard to the exercise of the functions of their government. Such power depends *solely* upon grants of power by Acts of the Legislature, and the Legislature may at any time modify, change or withdraw any power so granted by general law in conformance with the provisions of the Constitution, Article VI, Section 39(a).

Syllabus Point 2, *State ex rel. Alexander v. County Court of Kanawha County*, 147 W.Va. 693, 130 S.E.2d 200 (1963) (emphasis added).

Any attempt to read into W.Va. Code § 8-12-5(13), (36)-(39), (44) or (49) authority for a municipality to regulate the otherwise lawful possession or carrying of firearms on its premises other than by the manner expressly and specifically prescribed in W.Va. Code § 61-7-14 would constitute an impermissible judicial revision of a statute enacted by the Legislature. "A statute, or an administrative rule, may not, under the guise of 'interpretation,' be modified, revised, amended or rewritten." Syllabus Point 1, *Consumer Advocate Division v. Public Service Commission*, 182 W.Va. 152, 386 S.E.2d 650 (1989). It is not the province of courts to make or supervise legislation, and a statute may not, under the guise of interpretation, be modified, revised, amended, distorted, remodeled, or rewritten, or given a construction of which its words are not susceptible, or which is repugnant to its terms which may not be disregarded. *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W.Va. 137, 144-45, 107 S.E.2d 353, 358 (1959). "Where the words of a statute are plain, free of ambiguity, conveying a plain intent, there is no room for construction by a court, but only for obedience to the legislative will." Syllabus Point 1, *Kelley & Moyers v. Bowman*, 68 W.Va. 49, 69 S.E. 456 (1910).

> When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute.

Syllabus Point 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars, supra*.

> When a statute is clear and unambiguous and the legislative intent is plain the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute.

Syllabus Point 1, *State ex rel. Fox v. Board of Trustees of the Policemen's Pension or Relief Fund of the City of Bluefield, et al.*, 148 W.Va. 369, 135 S.E.2d 262 (1964). "Judicial interpretation of a statute is warranted only if the statute is ambiguous and the initial step in such interpretative inquiry is to ascertain the legislative intent." Syllabus Point 1, *Ohio County Commission v. Manchin*, 171 W.Va. 552, 301 S.E.2d 183 (1983).

Contrary to any argument that the grandfather clause in W.Va. Code § 8-12-5a (1999) somehow provides the required affirmative statutory authorization for South Charleston City Code § 545.15, the only significance of the grandfather clause in this action is to note that it is not part of Plaintiffs' basis for challenging South Charleston City Code § 545.15. W.Va. Code § 8-12-5a is an anomaly in the Municipal Code of West Virginia. Unlike almost every other statute dealing with municipal powers, W.Va. Code § 8-12-5a is entirely prohibitory in nature. The Legislature enacted W.Va. Code § 8-12-5a (1999) as a prophylactic measure to curtail the expansion of what remains a small patchwork quilt of local gun control ordinances throughout the 232 municipalities of this state. *See* Phil Kabler, *Pro-gun bill likely to win*, Charleston Gazette, Jan. 19, 1999, at A1.

Finally, the South Charleston Defendants assert that South Charleston City Code § 545.15 is authorized by W.Va. Code § 8-12-5(16), which provides:

In addition to the powers and authority granted by: (i) The constitution of this state; (ii) other provisions of this chapter; (iii) other general law; and (iv) any charter, and to the extent not inconsistent or in conflict with any of the foregoing except special legislative charters, every municipality and the governing body thereof shall have plenary power and authority therein by ordinance or resolution, as the case may require, and by appropriate action based thereon:

*   *   *

(16) To arrest, convict and punish any individual for carrying about his or her person any revolver or other pistol, dirk, bowie knife, razor, slingshot, billy, metallic or other false knuckles or any other dangerous or other deadly weapon of like kind or character[.]

This argument is extremely troubling. In order for this Court to hold that South Charleston City Code § 545.15 is authorized by W.Va. Code § 8-12-5(16) and thus valid as a matter of state law, it would have to hold that W.Va. Code § 8-12-5(16), in effect, gives municipalities *carte blanche* to regulate when, where, and by whom firearms may lawfully be carried. Indeed, as W.Va. Code § 8-12-5(16) is excepted entirely from the preemption provisions of W.Va. Code § 8-12-5a (1999), what the South Charleston Defendants are really contending is that all 232 municipalities in our state are authorized by state law to prohibit carrying handguns literally anywhere they choose within the bounds of the Constitution—which the South Charleston Defendants contend accords them broad latitude to prohibit virtually anything outside the four walls of one's home.

If this Honorable Court accepts this argument, it will give the green light to all 232 municipalities in our state to adopt a virtually limitless array of local laws regulating when, where—or even if—a law-abiding citizen, including those who are licensed under state law to carry a concealed handgun, may carry a handgun. Such ordinances will most surely not end with public buildings, parks and recreation areas. If a municipality can restrict where law-abiding adults may carry a handgun "for the children," as the South Charleston Defendants and Brady Center argue, why end at city buildings, parks, and recreation areas? Why not add a plethora of other places where families & children frequently congregate? Of course, since a potentially

errant bullet doesn't stop at a property line, why not several hundred—or thousand—feet of "safety zone" between places where families & children frequently congregate and where law-abiding adults may lawfully carry a handgun? *See, e.g., U.S. v. Campbell*, 12 F.3d 147 (8th Cir. 1994) (*per curiam*); *People v. Tapia*, 129 Cal.App.4th 1153, 29 Cal.Rptr.3d 158 (Cal.App. 2 Dist. 2005). That, of course, would eliminate virtually all public places other than bars—or "private clubs" in the nomenclature of West Virginia law, *see generally* W.Va. Code §§ 60-7-1 *et seq.*—and certain gambling establishments from the law-abiding handgun carrier's universe. In "private clubs," a municipality could undoubtedly use W.Va. Code § 8-12-5(16) to legislate against "mixing guns and alcohol . . . because of the high probability that violence could result," *U.S. v. Medina-Anicacio*, 325 F.3d 638, 646 n. 7 (5th Cir. 2003), and disarm law-abiding gun owners—drinking or not—in those few locations where the emotionally-driven "for the children" argument does not hold water. Or, a municipality could, if it wanted—and literally, under the terms of W.Va. Code § 8-12-5(16)—simplify things and *completely* prohibit anyone other than an on-duty law-enforcement officer from carrying a handgun in any manner at any time anywhere outside the four walls of the person's home.  This is inconsistent with the rights of Plaintiffs and other individuals licensed to carry concealed weapons, *see* W.Va. Code § 61-7-4(r) (2009), and the public policy of the state to recognize a broad individual right to carry firearms in most public places with relatively few restrictions as a matter of state law.  Most certainly, "reasonable doubt exists as to whether a municipal corporation has [this] power," and thus "the power **must** be denied." Syllabus Point 2, in part, *Hutchinson, supra* (emphasis added).

For the foregoing reasons, Plaintiffs respectfully submit that they have stated in Count 37 of their First Amended Complaint a claim upon which relief can be granted.

### B. South Charleston City Code § 545.15 is unconstitutional under the

### West Virginia Right to Keep and Bear Arms Amendment.

South Charleston City Code § 545.15 is an overly broad ordinance that violates Plaintiffs' right to keep and bear arms under W.Va. Const. Art. III, § 22, as it creates an impermissible presumption that anyone who is carrying a firearm in a manner otherwise compliant with federal and state law nevertheless becomes inherently dangerous by crossing the threshold of a doorway into any South Charleston city building or the invisible property line of a South Charleston city park or recreation area.

> Article III, section 22 of the West Virginia Constitution was approved by the voters of this State on November 4, 1986, and succinctly states: "A person has the right to keep and bear arms for the defense of self, family, home and state, and for lawful hunting and recreational use."

*State ex rel. City of Princeton v. Buckner*, 180 W.Va. 457, 459, 377 S.E.2d 139, 141 (1988).

W.Va. Const. Art. III, § 22, at its core, protects "the decent people of this state from being disarmed." James W. McNeely, *The Right of Who to Bear What, When, and Where—West Virginia Firearms Law v. The Right-to-Bear-Arms Amendment*, 89 W.Va. L. Rev. 1125, 1143, 1178 (1987) (article cited with approval extensively in *Buckner*). It "guarantee[s] that a person may exercise the choice to have arms to lawfully and effectively resist violent criminal aggression against self, family, or home." *Id.* This guarantee is not confined to the home or other narrowly-defined, purely private areas. *See State ex rel. City of Princeton v. Buckner, supra.*

In its analysis of facial challenges to laws implicating an individual's right to keep and bear arms under W.Va. Const. Art. III, § 22, the West Virginia Supreme Court of Appeals, at a time when the Second Amendment to the United States Constitution was neither regarded as an individual right nor applicable to the states, *id.* at 460 n. 6, 377 S.E.2d at 142 n. 6, held that the

16

First Amendment overbreadth doctrine is applicable to laws implicating the right to keep and

bear arms and that the court would not attempt to judicially reform or salvage an overbroad law.

> An "overbroad" law, as that term has been developed by the United States
> Supreme Court, is not vague, or need not be. Its vice is not failure to
> communicate. Its vice may be clarity. For a law is overbroad to the extent that it
> announces a prohibition that reaches conduct which may not be prohibited. A
> legislature can make a law as "broad" and inclusive as it chooses unless it reaches
> into constitutionally protected ground. The clearer an "overbroad" statute is, the
> harder it is to confine it by interpretation within its constitutionally permissible
> reach.

*Id.* at 462, 377 S.E.2d at 144 (citation omitted).

> The facts in this case are uncontroverted. On March 10, 1987, a municipal police
> officer in the City of Princeton, in Mercer County, stopped a vehicle and arrested
> the driver for driving under the influence of alcohol. After searching the driver,
> the policeman discovered a .22 caliber automatic pistol inside the driver's jacket
> pocket. The driver was then asked to produce a license allowing him to carry such
> a weapon, and he subsequently advised the police officer that he did not have
> such a license.

*Id.* at 458-59, 377 S.E.2d at 140-41.  Less than two years later, after the Legislature reformed

West Virginia's gun laws in light of *Buckner*, the court affirmed the constitutionality of W.Va.

Code § 61-7-3 (1989) (requiring license to carry a *concealed* weapon), holding that

> Article III, Section 22 of the West Virginia Constitution gives a citizen the
> constitutional right to keep and bear arms; however, there is no corresponding
> constitutional right to keep and bear **concealed** deadly weapons.

Syllabus Point 1, *Application of Metheney*, 182 W.Va. 722, 391 S.E.2d 635 (1990) (emphasis

added).  Had the court chosen to apply the general rule of facial challenges articulated in *Lewis v.*

*Canaan Valley Resorts, Inc.*, 185 W.Va. 684, 691, 408 S.E.2d 634, 641 (1991) ("The challenger

must establish that no set of circumstances exists under which the legislation would be valid; the

fact that the legislation might operate unconstitutionally under some conceivable set of

circumstances is insufficient to render it wholly invalid."), and its federal counterpart, *U.S. v.*

*Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most

17

difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."), it clearly would have decided *Buckner* differently, as the unnamed drunk driver was carrying his pistol inside a jacket pocket, which was obviously concealed and thus outside the specific protections of W.Va. Const. Art. III, § 22 under *Metheny*.  Likewise, the court could also have held that W.Va. Const. Art. III, § 22 does not protect the right of a person to carry a loaded pistol while under the influence of alcohol, as the legislative analysis and advertising materials promoting the Right to Keep and Bear Arms Amendment stated that the Amendment did not protect "carrying arms while intoxicated[.]" McNeely, 89 W.Va. L. Rev. at 1149.[1]

South Charleston City Code § 545.15 has practical application only against law-abiding adults who are otherwise in full compliance with federal and state gun laws. A violation of South Charleston City Code § 545.15 is punishable, at most, by a $500 fine and up to 30 days in jail. This penalty is no deterrent to a serious criminal.  W.Va. Code § 61-7-3 prohibits carrying a concealed weapon without a license.  Possession of a firearm by a prohibited possessor such as a convicted felon, drug addict, illegal alien, involuntarily committed person, person adjudicated as a mental defective, person subject to certain domestic violence protective orders, or person who has been convicted of certain domestic violence-related offenses, regardless of whether the firearm is carried openly or concealed, is generally prohibited by both Federal and State law. 18 U.S.C. §§ 922(g) and 924(a)(2); W.Va. Code § 61-7-7.  Federal and State laws also prohibit minors from carrying a handgun, either openly or concealed, in most public places. 18 U.S.C. §§ 922(x) and 924(a)(6); W.Va. Code § 61-7-8.  W.Va. Code § 61-7-11 prohibits a person from

---

[1]  Although W.Va. Code § 20-2-57b prohibits hunting while under the influence without regard to type of hunting equipment used, no West Virginia state law currently restricts or prohibits the possession or carrying of firearms or other weapons on the basis of intoxication.  Thus, West Virginia's courts have not been required to address this issue.

"carry[ing], brandish[ing] or us[ing any deadly] weapon in a way or manner to cause, or threaten, a breach of the peace."   W.Va. Code § 61-7-12 prohibits any person from "wantonly perform[ing] any act with a firearm which creates a substantial risk of death or serious bodily injury to another[.]"   Federal law provides severe penalties for "any person who, during and in relation to any crime of violence or drug trafficking crime . . . , uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm[.]" 18 U.S.C. § 924(c). In every case, any violation of any of these laws is punishable far more severely than a violation of South Charleston City Code § 545.15.  As the individual plaintiffs and other WVCDL members have concealed handgun licenses, it must be noted that

> [legislative] auditors and [West Virginia State Police Deputy Superintendent Steve] Tucker said they were unaware of an instance when an officer was confronted by someone licensed to carry a concealed weapon. "Anecdotally, concealed weapon permit holders are law-abiding citizens that we generally don't have as defendants in criminal cases," Tucker said.

Lawrence Messina, *Troopers Say Manpower Lacking*, Charleston Gazette, Nov. 19, 2008, at A1. For these reasons, South Charleston City Code § 545.15 is a direct attack on the core right of the decent people of this state to be armed.

As a law implicating a fundamental individual right—the absolute core of an individual's fundamental right to keep and bear arms for purposes of self-defense under W.Va. Const. Art. III, § 22—South Charleston City Code § 545.15 is subject to strict scrutiny under the West Virginia Constitution. "If the challenged [law] affects the exercise of a fundamental right . . . , the law will not be sustained unless the [government] can prove that the classification is necessary to the accomplishment of a compelling state interest." *Appalachian Power Co. v. State Tax Dep't*, 195 W.Va. 573, 594, 466 S.E.2d 424, 445 (1995) (citations omitted); *see also Board of Educ. of County of Kanawha v. West Virginia Bd. of Educ.*, 219 W.Va. 801, 807, 639 S.E.2d 893, 899 (2006) ("the strict scrutiny test is required when the law or governmental action at issue

impinges upon a fundamental right").  "[I]t is clear that . . . the right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty[,]" *McDonald v. City of Chicago*, 561 U.S. ___, ___, 130 S.Ct. 3020, 3042 (2010), and "this right is deeply rooted in this Nation's history and tradition." *Id.* at ___, 130 S.Ct. at 3036 (internal quotation marks and citation omitted).

The offensiveness of South Charleston City Code § 545.15 is underscored by the fact that, if upheld, it will deprive the decent, law-abiding people of this state, including the individual plaintiffs and other WVCDL members, of any means of self-defense if confronted by a criminal in a city-owned building, park or recreation area.

> Based upon information available to me, the defendants do not maintain any laws, customs, practices, or policies providing for the security of any city-owned buildings, parks, or other public property to which . . . South Charleston City Code § 545.15 . . . is applicable, under which individuals who enter places where . . . South Charleston City Code § 545.15 . . . prohibits carrying deadly weapons are required to submit to security screenings and adequate security measures are maintained to detect and interdict the unlawful conveyance of deadly weapons into those premises. Consequently, the laws, customs, practices, and policies of the Defendants challenged in this action provide no actual protection of any individuals present in city-owned buildings, parks, or other public property to which . . . South Charleston City Code § 545.15 . . . is applicable, as there are no adequate security measures in place to reliably detect and apprehend individuals violating the ordinance.

> The Defendants have no affirmative legal duty to guarantee the personal safety of individuals in locations where . . . South Charleston City Code § 545.15 . . . prohibits carrying weapons, nor would any of them be subject to any liability for any personal injuries or death suffered by any individual who is the victim of a crime in any location where . . . South Charleston City Code § 545.15 . . . prohibits carrying weapons and was unable to defend him- or herself because he or she was disarmed in compliance with the ordinance.

Schulz Dec. ¶¶ 24, 26.  The South Charleston Defendants further deprive Plaintiffs of the means of self-defense beyond the walls of the affected buildings and the city parks' and recreation areas' property lines:

> Based upon information available to me, the Defendants maintain laws, customs, practices, and policies that do not provide any means for individuals to temporarily check and store weapons in a secure storage facility prior to entering any premises where . . . South Charleston City Code § 545.15 . . . prohibits carrying weapons.

Schulz Dec. ¶ 25.

Contrary to alarmist assertions that Defendants might try to offer, WVCDL and its individual member Plaintiffs do not take the absolutist position that W.Va. Const. Art. III, § 22 requires the government to allow the bearing of arms by literally anyone, anywhere, any time.

> The West Virginia legislature may, through the valid exercise of its police power, reasonably regulate the right of a person to keep and bear arms in order to promote the health, safety and welfare of all citizens of this State, provided that the restrictions or regulations imposed do not frustrate the constitutional freedoms guaranteed by article III, section 22 of the West Virginia Constitution, known as the "Right to Keep and Bear Arms Amendment."

Syllabus Point 4, *State ex rel. City of Princeton v. Buckner, supra*.

Independent of its ongoing litigation efforts, WVCDL has pursued and continues pursuing legislative measures to reflect its views of what are just and reasonable laws. However, the types of laws WVCDL prefers are obviously far more narrowly-tailored than Defendants prefer. WVCDL strongly believes an individual's right to self-defense should extend to all public buildings owned or controlled by state and local government agencies and other publicly-owned property. It has long been a settled matter of law that an individual has no specific right to police protection. The last potential, meaningful right that an individual has to protect him- or herself from a criminal attack is the right to self-defense and the means to do so. When seconds count, the police are only minutes away. So-called "gun-free zones" generally amount to little more than criminal protection zones that instill a false sense of security in unsuspecting members of the public and provide criminals and deranged lunatics a free fire zone for the duration of the police response time.

WVCDL also recognizes that some public buildings—such as court facilities, *see* McNeely, 89 W.Va. L. Rev. at 1149, 1180—have sensitive security considerations that may legitimately warrant the exclusion of weapons from the premises.  However, without metal detectors, armed guards, and other meaningful, adequate security measures (similar to airports and the federal courthouse in which this Honorable Court sits), attempting to prohibit carrying weapons is a futile task, as criminals will carry regardless of any signs or additional criminal charges.  As the proponents of West Virginia's Right to Keep and Bear Arms Amendment stated:

> There is no social interest in preserving the lives and wellbeing of criminal aggressors at the cost of their victims. The only defensible policy society can adopt is one that will operate as a sanction against unlawful aggression. The police have no duty to protect the individual. *Warren v. District of Columbia*, 444 A.2d 1 (D.C. App. 1981) (en banc). One court reduced this principle of law to the succinct comment that "there is no constitutional right to be protected by the state against being murdered by criminals or madmen." *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982).

> The proposed guarantee is a victims' rights measure. It will guarantee that a person may exercise the choice to have arms to lawfully and effectively resist violent criminal aggression . . . .

McNeely, 89 W.Va. L. Rev. at 1177-78. For these reasons, WVCDL has advocated legislation, based in part upon Col. Rev. Stat. § 18-12-214(4) (2003), that would authorize any state or local government agency—including Defendants—to restrict or prohibit the possession or carrying of weapons in a "secure restricted access area" of any public building where specified security measures are in place.  *See generally*, 2011 W.Va. House Bill 3125; 2011 W.Va. Senate Bill 543; WVCDL, *West Virginia Gun Owner Protection Act of 2011*, http://www.wvcdl.org/WVCDLbills/WVGOPA2011.html (last accessed May 2, 2011). Unfortunately, at this time, even if Defendants adopted or wanted to adopt the proposed security measures outlined in proposed W.Va. Code § 61-7-11c of HB 3125 and SB 543, they lack

appropriate statutory authorization to do so.  Thus, this type of option is beyond this court's power to grant in this action.

For the foregoing reasons, Plaintiffs respectfully submit that they have stated in Count 36 of their First Amended Complaint a claim upon which relief can be granted.

### C. South Charleston City Code § 545.15 is unconstitutional under the Second Amendment.

South Charleston City Code § 545.15 violates Plaintiffs' right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution. The Second Amendment applies "*most notably* for self-defense within the home," *McDonald*, 561 U.S. at ___, 130 S. Ct. at 3044 (emphasis added), "where the need for defense of self, family, and property is most acute[,]" *Heller*, 554 U.S. at 628, but it does not end there. "[T]he core right identified in *Heller* [is] the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense[.]" *Chester*, 628 F.3d at 683.  This case involves law-abiding citizens who are asserting their right to carry handguns for self-defense, not habitual domestic violence offenders as in *Chester* and *U.S. v. Tooley*, 717 F.Supp.2d 580 (S.D. W.Va. 2010), who had clearly-demonstrated histories of violence and whose cases did not deal squarely with the Second Amendment's "core" right to self-defense.

As is the case under Plaintiffs' state constitutional argument in Part III.B., *supra*, South Charleston City Code § 545.15 creates an impermissible presumption that anyone who is carrying a firearm in a manner otherwise compliant with federal and state law nevertheless becomes inherently dangerous by crossing the threshold of a doorway into any building owned by the City of South Charleston or the property line of a South Charleston city park or recreation area. Defendants simply are not entitled to presume without proof that the practice of the constitutionally-protected right to bear arms is inherently dangerous. "[T]he enshrinement of

constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. "The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications." *McDonald*, 561 U.S. at ___, 130 S.Ct. at 3045.

"Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller*, we held that individual self-defense is 'the central component' of the Second Amendment right." *Id.* at ___, 130 S.Ct. at 3036 (*quoting Heller*, 554 U.S. at 599, 628) (footnote omitted). "[I]t is clear that . . . the right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty[,]" *id.* at ___, 130 S.Ct. at 3042, and "this right is deeply rooted in this Nation's history and tradition." *Id.* at ___, 130 S.Ct. at 3036 (internal quotation marks and citation omitted).

*Heller's* dissenters acknowledged that *Heller* protected the public carrying of arms:

> Given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home, I fear that the District's policy choice may well be just the first of an unknown number of dominoes to be knocked off the table.

*Heller*, 554 U.S. at 679-80 (Stevens, J., dissenting) (footnote omitted).

At this point, Plaintiffs must acknowledge that their Second Amendment claim is at odds with the 4th Circuit's recent decision in *U.S. v. Masciandaro*, ___ F.3d ___, 2011 WL 1053618 (4th Cir. Mar. 24, 2011).  Although the primary panel opinion in *Masciandaro* was authored by Judge Niemeyer, Judge Wilkinson, writing for the majority of the panel regarding Part III.B. of the *Masciandaro* panel opinion, cut off the Second Amendment right to bear arms at the walls of the home. 2011 WL 1053618 at *16-17.  Not content to academically lambaste *Heller* as the Supreme Court's worst and most "activist" decision since *Roe v. Wade, supra*, *see* Judge J. Harvie Wilkinson, III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 Va. L. Rev. 253 (2009), available at http://www.virginialawreview.org/content/pdfs/95/253.pdf, and fully accept

it as the law of the land, Judge Wilkinson used *Masciandaro* as a platform to completely misconstrue the limited relief sought by Mr. Heller and Mr. McDonald to deny the obvious individual right to keep and bear arms beyond the walls of the home the Supreme Court clearly saw in its dicta.  The *Masciandaro* panel majority opinion is devoid of any serious legal analysis on this point, which Judge Niemeyer rightfully criticized,  2011 WL 1053618 at *10 fn, as disregarding the need to "allow[] difficult issues to mature through full consideration by the courts of appeals." *E. I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 135 n. 26 (1977).  Moreover, the leading authority the *Masciandaro* panel majority cited for punting to the Supreme Court the question of whether the Second Amendment applies outside the home, *Williams v. State*, 417 Md. 479, 496, 10 A.3d 1167, 1177 (2011), is the subject of a pending petition for *cert*. 79 USLW 3594 (Apr. 5, 2011) (No. 10-1207). Given the recency and unsettled nature of the *Masciandaro* panel opinion and its supporting legal authority, Plaintiffs respectfully submit that this Honorable Court should not base its decision regarding Count 38 of the First Amended Complaint on the *Masciandaro* panel decision at this time, but instead allow proceedings in this action to continue until this Court has the benefit of a final decision in *Masciandaro* and the disposition of the *cert* petition in *Williams v. Maryland*.

Facial challenges to a statute or regulation based on overbreadth are recognized in a number of different settings, including but not limited to the First Amendment. *See Sabri v. United States*, 541 U.S. 600, 610 (2004) (collecting cases). *See also Chester*, 628 F.3d at 682 (First Amendment a guide in developing standards of review for the Second Amendment). The overbreadth doctrine should apply to constitutional challenges involving the Second Amendment just as West Virginia's courts apply it to W.Va. Const. Art. III, § 22. *Buckner*, 180 W.Va. at 462, 377 S.E.2d at 144.

Because Plaintiffs are among the class of "law-abiding, responsible citizen[s,]" *Chester*, 628 F.3d at 683, who enjoy the highest level of protection of their individual right to keep and bear arms and the right to keep and bear arms is a fundamental right, *McDonald*, 130 S.Ct. at 3036, 3042; *Heller*, 554 U.S. at 599, 628, Plaintiffs submit that their Second Amendment claim against South Charleston City Code § 545.15 must be analyzed under strict scrutiny. *Chester* explained that where applicable, the means-ends standard of review in Second Amendment cases is either strict or intermediate scrutiny, depending on the nature of the claim asserted. 628 F.3d at 682. "[C]lassifications affecting fundamental rights are given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (internal citation omitted).  Because Plaintiffs are among the class of "law-abiding, responsible citizen[s,]" *Chester*, 628 F.3d at 683, who enjoy the highest level of protection of their individual right to keep and bear arms, *Chester's* holding adopting intermediate scrutiny for a challenge to the federal prohibition on possession of firearms by domestic violence misdemeanants is inapposite.  To withstand the strict scrutiny analysis, Defendants must prove that they have a compelling interest that relates to the restriction at issue and must demonstrate that they has narrowly tailored the challenged ordinance so as to minimize the burden on Plaintiffs' rights while furthering that compelling interest. *Abrams v. Johnson*, 521 U.S. 74, 82 (1997). While public safety may be a compelling interest, South Charleston's firearm prohibition—whose primary enforcement mechanism is apparently a few signs on the doors and a low-level misdemeanor criminal penalty—serves only to deter the most "law-abiding, responsible citizen[s,]" *Chester*, 628 F.3d at 683, from exercising their right to keep and bear arms and is certainly not narrowly tailored. Defendants cannot meet that burden.

Even if intermediate scrutiny is applicable, "the government must demonstrate . . . that there is a reasonable fit between the challenged regulation and a substantial government

26

objective." *Chester*, 628 F.3d at 683 (internal quotation marks and citations omitted).  It is the Defendants' burden to prove that the ordinance furthers public safety. *See Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1082 (4th Cir. 2006). Regardless of the level of scrutiny, Defendants cannot meet their burden under the Constitution.

For the foregoing reasons, Plaintiffs respectfully submit that they have stated in Count 35 of their First Amended Complaint a claim upon which relief can be granted.


## IV. CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Honorable Court deny the South Charleston Defendants' pre-answer motion to dismiss and direct the South Charleston Defendants to answer Plaintiffs' First Amended Complaint pursuant to Fed. R. Civ. P. 12(a)(4)(A).   Alternatively, Plaintiffs request leave to file a further Amended Complaint should this Honorable Court find any insufficiency in their First Amended Complaint.


Dated this 2nd day of May, 2011,



        s/ James M. Mullins, Jr.
James M. Mullins, Jr.        (WV State Bar # 11129)
            Attorney for All Plaintiffs
The Law Offices of James M. Mullins, Jr., PLLC
101 North Kanawha Street, Suite 401
Beckley, WV 25801
Telephone: 304-929-3500 (o)/304-687-5492 (c)
FAX: 304-929-3503
E-mail: jim@mullinslawoffices.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2011, I electronically filed the foregoing document with the Clerk of the Court, which will send electronic notification of such filing to the following CM/ECF participants:

W. Michael Moore
Alicia A. Deligne
Moore & Biser PLLC
317 Fifth Avenue
South Charleston, WV 25303
Attorneys for City of South Charleston, Frank Mullens, and Brad Rinehart

Webster J. Arceneaux, III
Spencer D. Elliott
Lewis Glasser Casey & Rollins, PLLC
PO Box 1746
Charleston, WV 25326
Attorneys for City of South Charleston, Jack Yeager, and Earl Whittington

Benjamin L. Bailey
Ricklin Brown
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
Attorneys for City of Charleston, Danny Jones, and Brent Webster

Ashley W. French
Huddleston Bolen LLP
PO Box 3786
Charleston, WV 25337
Attorney for *amicus curiae* Brady Center to Prevent Gun Violence



    s/ James M. Mullins, Jr.
James M. Mullins, Jr.        (WV State Bar # 11129)
       Attorney for All Plaintiffs
The Law Offices of James M. Mullins, Jr., PLLC
101 North Kanawha Street, Suite 401
Beckley, WV 25801
Telephone: 304-929-3500 (o)/304-687-5492 (c)
FAX: 304-929-3503
E-mail: jim@mullinslawoffices.com