IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

West Virginia Citizens Defense League, Inc.,
   *et al.*,

               Plaintiffs,                   Civil Action No.: 2:11-cv-48

                                      (Copenhaver, J.)

                    v.

City of Charleston, *et al.*,

               Defendants

---

## PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE AND OPPOSITION TO

## CHARLESTON DEFENDANTS' FIRST MOTION TO DISMISS

     Plaintiffs, by and through their undersigned counsel, respectfully submit the following in response and opposition to the Charleston Defendants' pre-answer motion to dismiss. [Doc. 16].

## I. INTRODUCTION

     On January 24, 2011, Plaintiffs filed the instant action.  [Doc. 1]. On March 16, 2011, Plaintiffs filed their First Amended Complaint. [Doc. 13]. On March 28, 2011, the Charleston Defendants filed a pre-answer motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6), [Doc. 16], alleging lack of standing by Plaintiffs and failure to state a claim upon which relief may be granted and a memorandum of law in support of said motion, [Doc. 17].  For the reasons stated herein, Plaintiffs respectfully requests that this Honorable Court deny the Charleston Defendants' Pre-Answer Motion to Dismiss or, in the alternative, grant Plaintiffs leave to file an amended Complaint in light of any deficiencies this Honorable Court may identify.

## II. PLAINTIFFS HAVE STANDING TO SUE.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  The Charleston Defendants' contention that this Honorable Court is without jurisdiction to hear Plaintiffs' challenge to the Charleston city ordinances at issue because no individual plaintiff or other member of West Virginia Citizens Defense League, Inc. (hereinafter "WVCDL"), has been identified as under an immediate, actual threat of criminal prosecution, is contrary to recent Supreme Court precedent. This action is not about some academic debate "'in the rarefied atmosphere of a debating society' rather than 'in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.'" *Falwell v. City of Lynchburg*, 198 F.Supp. 2d 765, 772 (W.D. Va. 2002) (*citing Piney Run Preservation Assoc. v. County Comm'ners*, 268 F.3d 255 (4th Cir. 2001)). Although there must be some minimal threat of adverse action before an allegedly threatened party gains standing to sue,

> where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) (8-1 decision).  With the exception of *Montana Shooting Sports Ass'n v. Holder*, 2010 WL 3926029 (D. Mont. Aug. 31, 2010)*,* the federal cases cited by the Charleston Defendants supporting a more restrictive standard for standing predate *MedImmune*, which is controlling in this case.

In this case, the Charleston Defendants are mounting only a "facial attack"—as opposed to a "factual attack"—on the Complaint's allegations regarding whether any individual plaintiff or other identified WVCDL member would otherwise have standing to sue as individuals under

*Thigpen v. United States*, 800 F.2d 393 (4th Cir. 1986). *See also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). As this Court has recently explained:

> Generally, challenges to jurisdiction under Rule 12(b)(1) may be raised in two distinct ways: "facial attacks" and "factual attacks." *Thigpen*[], 800 F.2d [at] 401 n. 15[]. A "facial attack" questions whether the allegations in the complaint are sufficient to sustain the court's jurisdiction. *Id.* If a "facial attack" is made, the court must accept the allegations in the complaint as true and decide if the complaint is sufficient to confer subject matter jurisdiction. *Id.*
>
> On the other hand, a "factual attack" challenges the truthfulness of the factual allegations in the complaint upon which subject matter jurisdiction is based. In this situation, a "district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."

*Ohio Valley Environmental Coalition, Inc. v. Apogee Coal Co., LLC*, 531 F.Supp.2d 747, 764 (S.D. W.Va. 2008) (internal citations and footnote omitted) ("OVEC I").

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (*quoting Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)) (quotation marks and alteration in original).  A plaintiff's standing oes not depends not upon the merits, *see Warth*, 422 U.S. at 500, but on "whether the plaintiff is the proper party to bring [the] suit." *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *see also Libertad v. Welch*, 53 F.3d 428, 437 n.5 (1st Cir. 1995) ("An analysis of a plaintiff's standing focuses not on the claim itself, but on the party bringing the challenge; whether a plaintiff's complaint could survive on its merits is irrelevant to the standing inquiry."). If a plaintiff's legally-protected interest hinged on whether a given claim could succeed on the merits, then "every unsuccessful plaintiff will have lacked standing in the first place." *Claybrook v. Slater*, 111 F.3d 904, 907 (D.C. Cir. 1997).

It is well-settled that an individual has standing to sue if (1) the person has suffered an actual or threatened injury that is not conjectural or hypothetical, (2) the injury is fairly traceable to the challenged conduct; and (3) a favorable decision is likely to redress the injury. *Defenders of Wildlife*, 504 U.S. at 560-61; *Allen v. Wrigh*t, 468 U.S. 737, 751 (1984).

The individual plaintiffs are residents of Kanawha County, West Virginia, and members of WVCDL.  (Complaint ¶¶ 2, 4, 7-8, 9-10). Plaintiffs Keith Morgan, Elizabeth Morgan, and Jereomy Schulz have West Virginia concealed handgun licenses and usually carry a handgun except when and where prohibited by law. Declaration of Keith T. Morgan ("K.T. Morgan Dec.") at ¶¶ 9, 11; Schulz Dec. [Doc. 26-1] at ¶¶ 8, 10; E.L. Morgan Dec. [Doc. 27-1] at ¶¶ 8, 10. They are deprived of their right to keep and bear arms every time he sets foot on any real property owned by the City of Charleston.  K.T. Morgan Dec. at ¶¶ 12, 14-15, 17-19. The Charleston Civic Center—one of the buildings where Plaintiffs would like to exercise their right to keep and bear arms—has signs posted at its entrance clearly stating:

> WEAPONS PROHIBITED ON CIVIC CENTER PROPERTY PER CHARLESTON CITY CODE SECTION 78-165 IT SHALL BE UNLAWFUL FOR ANY PERSONS TO CARRY ON OR ABOUT HIS PERSON ANY REVOLVER OR PISTOL, DIRK, BOWIE, KNIFE, SLINGSHOT, RAZOR, BILLY, METALLIC OR OTHER FALSE KNUCKLES, OR OTHER DANGEROUS OR DEADLY WEAPON OF LIKE KIND OR CHARACTER IN OR UPON THE CHARLESTON CIVIC CENTER. PROVISIONS OF THIS SECTION SHALL NOT APPLY TO CITY, COUNTY, STATE AND FEDERAL LAW ENFORCEMENT OFFICERS AND EXHIBITORS AND PERFORMERS AT CITY SANCTIONED EVENTS WHO OBTAIN ADVANCED WRITTEN AUTHORIZATION FROM THE CHIEF OF POLICE OF THE CITY OF CHARLESTON..

*Id.* at ¶ 16. Plaintiffs' desire to engage in conduct prohibited by the challenged ordinances is far from speculative.

> If the Charleston handgun sales ordinances WVCDL and I individually are challenging in this action are repealed or, in a final judgment of this Court or another court of competent jurisdiction, are permanently enjoined or are declared in a declaratory judgment to be unconstitutional or otherwise legally invalid such

> that I may proceed with the purchase I planned on January 23, 2011, I intend to return to the Gander Mountain store located in the City of Charleston and purchase a Kel-Tec P3AT pistol identical to the one I selected on January 23, 2011, if such handgun is available at that time for the same price as it was offered for sale on January 23, 2011.
>
> But for the ongoing threatened enforcement of Charleston City Code § 78-165, . . . I would regularly carry handguns when I visit various locations described in Charleston City Code § 78-165 . . . ."

K.T. Morgan Dec. at ¶¶ 21, 28; *see also* Schulz Dec. [Doc. 26-1] at ¶¶ 19, 23; E.L. Morgan Dec. [Doc. 27-1] at ¶ 19. The loss of Second Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (citation and footnote omitted).

> Given *Heller's* focus on "core" Second Amendment conduct and the Court's frequent references to First Amendment doctrine, we agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment.

*U.S. v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010).

In *Mobil Oil Corp. v. Attorney General of Virginia*, 940 F.2d 73, 76 (4th Cir. 1991), the court clearly rejected the extreme interpretation of its earlier decision in *Doe v. Duling*, 782 F.2d 1202 (4th Cir. 1986), now asserted by the Charleston Defendants. *Duling* involved a "challenge[] on privacy grounds [to] a nineteenth century fornication statute which had not been enforced in private homes for years, if not decades." *Mobil Oil*, 940 F.2d at 76 (*quoting American Booksellers Ass'n, Inc. v. Virginia*, 802 F.2d 691, 694 n. 4 (4th Cir. 1986)). The Charleston ordinances at issue were all enacted within the last 18 years. Here, as in *American Booksellers* and *Mobil Oil*, we are dealing with a recently-enacted law, not some anachronistic throwback to a prior century that was being openly violated en masse without any enforcement action of any kind. The signs placed at the entrances to the Charleston Civic Center clearly and

unambiguously threaten the criminal prosecution of anyone who violates Charleston City Code §
78-165.  Benjamin Ellis and Masada Enterprises LLC each have an extremely palpable interest
in resolving the effect of the Charleston handgun sales ordinances on their activities given the
ordinances' vagueness. Like Mobil Oil, Plaintiffs have "alleged 'an actual and well-founded
fear' that the law will be enforced, and ha[ve] in fact 'self-censored' [themselves] by complying
with the statute, incurring harm all the while." *Mobil Oil*, 940 F.2d at 76.

Plaintiffs simply are not "required to await and undergo a criminal prosecution as the sole
means of seeking relief." *Doe v. Bolton*, 410 U.S. 179, 188 (1973). As the Supreme Court more
recently and clearly explained:

> where threatened action by government is concerned, we do not require a plaintiff
> to expose himself to liability before bringing suit to challenge the basis for the
> threat—for example, the constitutionality of a law threatened to be enforced. The
> plaintiff's own action (or inaction) in failing to violate the law eliminates the
> imminent threat of prosecution, but nonetheless does not eliminate Article III
> jurisdiction.

*MedImmune*, 549 U.S. at 128-29.  *MedImmune* is particularly important not only for its recency
and clarity regarding pre-enforcement challenges to government actions, but the fact that
significantly broadened the federal courts' jurisdiction to hear declaratory judgment actions
between purely private actors who sought to test their legal rights before actually taking actions
that might affect their respective legal rights and obligations.

Per the advice of the 4th Circuit in *Mobil Oil* and the Supreme Court in *MedImmune*,
Plaintiffs "prefer 'official adjudication to public disobedience.'" *National Rifle Ass'n v. Magaw*,
132 F.3d 272, 287 (6th Cir. 1997)  (*quoting* 13A, Charles A. Wright, Arthur R. Miller & Edward
H. Cooper, *Federal Practice and Procedure*, § 3532.5, at 183-84 (2d ed. 1984)).[1]

---

[1]  The 4th Circuit has not adopted the more restrictive standards for standing prevailing in the 6th Circuit
and D.C. Circuit to which Defendants cite.  The standard for standing to seek a declaratory judgment
stated by the Supreme Court in *MedImmune*, 549 U.S. at 128-29, is controlling.

> Public policy should encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power, all the while complying with the challenged law, rather than to deliberately break the law and take his chances in the ensuing suit or prosecution.

*Mobil Oil*, 940 F.2d at 75. This concern is particularly acute in light of the handgun sales ordinances' vagueness. *See* Part III.A. *infra*. A challenge to a firearms prohibition is justiciable where "the plaintiffs wish to engage in conduct plainly prohibited on the face of the allegedly unconstitutional statute." *Coalition of New Jersey Sportsmen v. Whitman*, 44 F.Supp.2d 666, 673 n.10 (D. N.J. 1999), *aff'd*, 263 F.3d 157 (3d Cir.) (mem.), *cert. denied*, 534 U.S. 1039 (2001). Unlike *Coalition of New Jersey Sportsmen*, Plaintiffs' claims are more palpable, as the scope of prohibited conduct is so unclear as to be void for vagueness. *See* Part III.A. *infra*. Moreover, Plaintiffs Keith Morgan and Elizabeth Morgan are suffering on ongoing violation of their rights under Section 7 of the Privacy Act of 1974 resulting from the Charleston Defendants' maintenance of records of past handgun purchases containing their respective Social Security account numbers, which they were unlawfully compelled to disclose

Finally, although in some sense there could be an argument that some of the injuries of which Plaintiffs complain are not ongoing, Plaintiffs' injuries are certainly repetitive in nature. Repetitive injuries do not evade judicial review. *See, e.g., Roe v. Wade*, 410 U.S. 113, 125 (1973); *Bolton*, 410 U.S. at 187-88.

There is no reason to dispute that Plaintiffs' injuries in this action are fairly traceable to the challenged conduct, as the Charleston Defendants' threatened enforcement of the ordinances at issue is the entire basis of this action. Nothing in this action is based upon "the independent action of some third party not before the court." *Defenders of Wildlife*, 504 U.S. at 560-61 (*quoting Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976)). As it relates to Plaintiffs' challenges to the Charleston's handgun sales ordinances, the act of Gander

Mountain refusing to immediately deliver and complete the sale of handguns to Mr. Morgan and Mr. Schulz on January 23, 2011, is not an independent act that denies this Court jurisdiction over their claims in this action. In *Dearth v. Holder*, ___ F.3d ___, 2011 WL 1437379 (D.C. Cir. Apr. 15, 2011), the court held that a United States citizen living abroad who attempted to purchase firearms from a licensed dealer and was denied the proposed purchases on the grounds that federal law prohibited a person who does not reside within any state from purchasing firearms, 18 U.S.C. § 922(a)(9), had an ongoing injury that was sufficient to plead a real and immediate injury for purposes of standing.  Here, Mr. Morgan and Mr. Schulz each made a good faith attempt to purchase handguns from a licensed dealer within and subject to the ordinances at issue, and both were denied their attempted purchases because they refused to comply with the ordinances they are now challenging.

It is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision[,]" *id.* (*quoting Simon*, 426 U.S. at 38, 43) (internal citation and quotation marks omitted), because an injunction against the challenged ordinances will relieve all Plaintiffs from the burdens of the ordinances. Conversely, if this Honorable Court sees fit to deny injunctive relief but instead grants a declaratory judgment declaring the challenged ordinances unconstitutional or void under state law, such relief would also redress Plaintiffs' injury because the judgment would clearly signal to the Defendants and the local courts that the ordinances are unenforceable.

WVCDL is a plaintiff in this action on behalf of its members under its "associational standing," under which

> An association has standing to sue on behalf of its members when: (1) at least one of its members would have individual standing to sue in his or her own right, (2) the interests the organization seeks to protect are germane to its purpose, and (3) there is no need for the direct participation of individual members in the action.

8

*Ohio Valley Envtl. Coalition, Inc. v. Hobet Mining, LLC*, 702 F. Supp. 2d 644, 649 (S.D. W. Va. 2010) ("OVEC II"); *see also Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (citations omitted).

In their pending motion to dismiss, the Charleston Defendants seriously contest only whether WVCDL has alleged that its members meet the first element of associational standing—whether "its members would have individual standing to sue in his or her own right[.]" *OVEC II*, 702 F. Supp. 2d at 649. The Charleston Defendants do not attack the truthfulness of the factual statements in the complaint.  The Charleston Defendants do not dispute that "the interests [WVCDL] seeks to protect are germane to its purpose," *id.*, nor do they advance any argument that "there is [a] need for the direct participation of individual [WVCDL] members in the action." *Id.*

With regard to each issue this Court finds at least one plaintiff with standing to sue, this Court need not address whether the other plaintiffs have standing on that issue. In cases where plaintiffs seek declaratory and injunctive relief, so long as "at least one individual plaintiff . . . has demonstrated standing," a court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n. 9 (1977); *see also Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981). Only if a plaintiff "obtains relief different from that sought by plaintiffs whose standing has not been questioned," must this Court address the other plaintiffs' standing to sue. *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 402 n.22 (1982).

## III. PLAINTIFFS HAVE STATED CLAIMS

## UPON WHICH RELIEF CAN BE GRANTED.

Counts 1 through 34 of Plaintiffs' First Amended Complaint allege claims upon which relief can be granted by this Honorable Court. "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks, alterations, and citation omitted). When ruling on a Rule 12(b)(6) motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning the court could draw "the reasonable inference that the defendant is liable for the conduct alleged." *Ashcroft v. Iqbal*, 556 U.S. ___, ___, 129 S.Ct. 1937, 1949 (2009). The purpose of the pleading requirements is threefold: first, "early disposition of inappropriate complaints"; second, "provid[ing] criteria for defining issues for trial"; and third, which is most significant to the present case, assuring the defendants have received "adequate notice of the nature of a claim being made against [them]." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).

### A. Counts 1 and 2: Charleston's handgun sales ordinances are void for vagueness.

The provisions of Charleston City Code §§ 18-421 through 428, referring to prohibiting various acts by any "person or dealer" or words to a similar effect, are void for vagueness because they are not sufficiently explicit to inform a reasonable person who is subject to those provisions whether those provisions regulate the transfer of handguns not only by licensed

dealers, but also by literally any other person, including any resident of the City of Charleston who may attempt to sell, loan, or rent a handgun from his or her personal collection, or any resident of the City of Charleston who may purchase or rent a handgun for any purpose within or without the territorial limits of the City of Charleston.  These ordinances simply lack on their face the essential guardrails required by the Constitution.

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut(s) upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of (those) freedoms." Uncertain meanings inevitably lead citizens to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked."

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (footnotes omitted).  The challenged ordinances meet none of these basic due process protections.

The West Virginia Supreme Court of Appeals follows similar standards for determining whether a law is void for vagueness under the Due Process Clause of W.Va. Const. Art. III, § 10.

> A criminal statute must be set out with sufficient definiteness to give a person of ordinary intelligence fair notice that his contemplated conduct is prohibited by statute and to provide adequate standards for adjudication.

> Statutes involving a criminal penalty, which govern potential First Amendment freedoms or other similarly sensitive constitutional rights, are tested for certainty and definiteness by interpreting their meaning from the face of the statute.

Syllabus Points 1-2, *State v. Flinn*, 158 W.Va. 111, 208 S.E.2d 538 (1974).

For the foregoing reasons, Plaintiffs respectfully submit that they have stated in Counts 1 and 2 of their First Amended Complaint claims upon which relief can be granted.

### B. Counts 5, 8, 11, 26, 29, 30, and 31: Charleston's handgun sales ordinances are unauthorized and void as a matter of state law.

The challenged Charleston handgun sales ordinances void as a matter of state law because they are not specifically and expressly authorized by statute. Nowhere in West Virginia law is there any authorization for any municipality to ration handgun sales (Count 5), impose a waiting period on handgun sales (Count 8), require the registration of handgun sales (Count 11), or supplement the categories of individuals prohibited by Federal or State law from purchasing or possessing handguns (Counts 29-31).

W.Va. Const. Art. VI, § 39a, the "Municipal Home Rule Amendment," which was adopted in 1936, simply does not give municipalities the broad, general police powers that the Charleston Defendants wish they could have.[2]  Those powers that the Legislature has granted to all or some classes of municipalities in this state have been granted with great specificity. Defendants are no stranger to the limitations under which they operate.

> A municipal corporation is a creature of the State, and can only perform such functions of government as may have been conferred by the Constitution, or delegated to it by the law-making authority of the State. It has no inherent powers, and only such implied powers as are necessary to carry into effect those expressly granted.

Syllabus Point 1, *Brackman's Inc., v. City of Huntington*, 126 W.Va. 21, 27 S.E.2d 71 (1943).

> Municipalities have no inherent power with regard to the exercise of the functions of their government. Such power depends **solely** upon grants of power by Acts of the Legislature, and the Legislature may at any time modify, change or withdraw any power so granted by general law in conformance with the provisions of the Constitution, Article VI, Section 39(a).

Syllabus Point 2, *State ex rel. Alexander v. County Court of Kanawha County*, 147 W.Va. 693, 130 S.E.2d 200 (1963) (emphasis added).

---

[2]  The source of the powers possessed by the West Virginia Legislature to regulate the keeping and bearing of arms is derived from the police powers of the state. Syllabus Point 4, *State ex rel. City of Princeton v. Buckner*, 180 W.Va. 457, 377 S.E.2d 139 (1988).

The West Virginia Supreme Court of Appeals has long recognized that municipalities derive their power from the Legislature and are subject to its strict control of their actions. The court has also long construed municipal powers with the most exacting scrutiny under which it maintains a strong presumption against the recognition of any power claimed by a municipality, which the municipality bears a heavy burden to overcome.

"A municipal corporation possesses no inherent police power. It has only such regulatory authority as has been expressly or impliedly delegated to it by the Legislature." Syllabus Point 1, *State ex rel. Kelley v. City of Grafton*, 87 W.Va. 191, 104 S.E. 487 (1920). "A statutory grant of power to a municipal corporation will be strictly construed[.]" *Law v. Phillips*, 136 W.Va. 761, 778-79, 68 S.E.2d 452, 462 (1952).

> A municipal corporation has only the powers granted to it by the legislature, and any such power it possesses must be expressly granted or necessarily or fairly implied or essential and indispensable. If *any* reasonable doubt exists as to whether a municipal corporation has a power, the power *must* be denied.

Syllabus Point 2, *State ex rel. City of Charleston v. Hutchinson*, 154 W.Va. 585, 176 S.E.2d 691 (1970) (emphasis added).

> Municipalities are but political subdivisions of the state, created by the Legislature for purposes of governmental convenience, deriving not only some, but all, of their powers from the Legislature. They are mere creatures of the Legislature, exercising certain delegated governmental functions which the Legislature may revoke at will. In fact, public policy forbids the irrevocable dedication of governmental powers. The power to create implies the power to destroy.

*Booten v. Pinson*, 77 W.Va. 412, 421, 89 S.E. 985, 989 (1915). Applying these strict limitations of municipal power, the court held that

> [m]unicipal charter provisions that authorize law enforcement officers, municipal clerks or their deputies to issue arrest warrants are invalid because they conflict with and *exceed* powers legislatively granted to municipalities.

Syllabus, in part, *State ex rel. Hill v. Smith*, 172 W.Va. 413, 305 S.E.2d 771 (1983) (emphasis added) (*citing* W.Va. Code §§ 8-10-1 and 2; W.Va. Const. Art. VIII, § 12).

As is evident from any rational reading of the statutes cited by the Charleston Defendants, the above case law, and other related statutes and cases, the City of Charleston has the same power under state law to adopt and maintain the challenged ordinances as it does to, for example, adopt a municipal ordinance requiring a person to have a prescription in order to purchase cold medicines containing pseudoephedrine or other precursors of methamphetamine in order to combat the allegedly growing public health and safety problem of methamphetamine laboratories.[3]  If the Charleston Defendants truly possessed the powers they now claim, why would they not be able to take action to combat what they have alleged is a growing public safety problem that they have implicitly alleged the Legislature has neglected?[4]  The reason, of course, is that just as their limited powers under state law do not permit them to adopt a pseudoephedrine prescription ordinance to combat the meth lab problem, those powers truly did not authorize them to pass the litany of handgun sales ordinance they enacted in 1993 and have enforced ever since without challenge—until now.

The Charleston Defendants' arguments are unpersuasive.  Their powers "to adopt ordinances relating to 'general public health, safety or welfare," [Doc. 17] at 19 (citing W. Va. Code § 8-11-4), are not a plenary grant of the state's police powers.  More fully, the referenced power is the power of a municipality to

---

[3]  Defendants Danny Jones and Brent Webster strongly advocated during the 2011 regular session of the Legislature an unsuccessful bill to require a prescription for all purchases of cold medicines containing pseudoephedrine or certain other precursors of methamphetamine. *See* Alison Knezevich, *Police push for meth-lab bill*, Charleston Gazette, March 4, 2011, at A1, available at http://www.wvgazette.com/News/201103031151

[4]  *But see generally* Mark Schnyder, *Wildwood becomes Missouri's 31st city to ban over-the-counter Pseudoephedrine*, KMOV.com, April 29, 2011, http://www.kmov.com/news/local/Wildwood-becomes-Missouris-31st-city-to-ban-over-the-counter-Pseudoephedrine-120955224.html

> adopt, by ordinance, building codes, housing codes, plumbing codes, sanitary codes, electrical codes, fire prevention codes, or any other technical codes dealing with general public health, safety or welfare, or a combination of the same[.]

W. Va. Code § 8-11-4(b). In case there is any doubt as to the limits of this power, this subsection further provides: "The ordinance adopting such code shall not set out said code in full, but shall merely identify the same." *Id.* The case upon which the Charleston Defendants heavily rely, *Perdue v. Ferguson*, 177 W.Va. 44, 350 S.E.2d 555 (1986), is inapposite because the presumption that an ordinance was "passed in good faith," and that the "legislative body of the municipality acted in the best interest of the community," *id.* at 48, 350 S.E.2d at 560, presumes that the municipal governing body had some statutory authority to act on the subject matter at hand in the first place, which the City of Huntington clearly had. *Id.* at 45 n. 1, 350 S.E.2d at 557 n. 1.  Here, the Defendants' fundamental authority to pass the challenged ordinances is at issue and outside *Perdue's* presumptions.

Finally, the Charleston Defendants argue that the grandfather clause in W.Va. Code § 8-12-5a (1999) somehow provides the required affirmative statutory authorization for the challenged ordinances. The grandfather clause has no bearing on this case. The only significance of the grandfather clause in this action is to note that it is not part of Plaintiffs' basis for challenging any of the ordinances at issue.  W.Va. Code § 8-12-5a is an anomaly in the Municipal Code of West Virginia.  Unlike virtually every other statute dealing with municipal powers, W.Va. Code § 8-12-5a is entirely prohibitory in nature.  The Legislature first enacted W.Va. Code § 8-12-5a in 1982 as a prophylactic measure to protect an individual's right to gun ownership prior to the adoption of W.Va. Const. Art. III, § 22, *see* Part III.C., *infra*, and the recognition of. The Legislature revised W.Va. Code § 8-12-5a in 1999 to clarify that it intended to curtail the expansion of a then-emerging patchwork quilt of local gun control ordinances throughout the 232 municipalities of this state. *See* Phil Kabler, *Pro-gun bill likely to win*,

Charleston Gazette, Jan. 19, 1999, at A1.  The first sentence of the original enactment of W.Va. Code § 8-12-5a, which was  in effect from 1982 to 1999 and which Plaintiffs submit is controlling with regard to the Charleston handgun sales ordinances, provided, in pertinent part:

> The provisions of section five of this article notwithstanding, neither a municipality nor the governing body of any municipality shall have the power to limit the right of any person to own any revolver, pistol, rifle or shotgun or any ammunition or ammunition components to be used therewith nor to so regulate the keeping of gunpowder so as to directly or indirectly prohibit the ownership of such ammunition.

W.Va. Code § 8-12-5a (1982); 1982 W.Va. Acts Ch. 111.[5]  Assuming this Court finds some statutory authority in W.Va. Code § 8-12-5 for the challenged handgun sales ordinances, Plaintiffs respectfully submit that those ordinances constitute a limitation on "the right of any person to own any revolver [or] pistol," W.Va. Code § 8-12-5a (1982), that was preempted by the version of the preemption law existing in 1993 and is thus void on those grounds.  The plain text of both the 1982 and 1999 versions of the preemption statute show only a legislative intent to preempt—not to authorize anything.  This fact is highlighted by the apparent lack of prior challenges to Charleston's handgun sales ordinances and thus a dearth of any legal authority on either side of the question of whether these ordinances were authorized in the first instance.  That is the question we now face.

---

[5]  W.Va. Code § 8-12-5a (1999), *see* 1999 W.Va. Acts Ch. 290, provides, in full:

The provisions of section five of this article notwithstanding, neither a municipality nor the governing body of any municipality may limit the right of any person to purchase, possess, transfer, own, carry, transport, sell or store any revolver, pistol, rifle or shotgun or any ammunition or ammunition components to be used therewith nor to so regulate the keeping of gunpowder so as to directly or indirectly prohibit the ownership of the ammunition. Nothing herein shall in any way impair the authority of any municipality, or the governing body thereof, to enact any ordinance or resolution respecting the power to arrest, convict and punish any individual under the provisions of subdivision (16), section five of this article or from enforcing any such ordinance or resolution: *Provided*, That any municipal ordinance in place as of the effective date of this section shall be excepted from the provisions of this section: *Provided, however*, That no provision in this section may be construed to limit the authority of a municipality to restrict the commercial use of real estate in designated areas through planning or zoning ordinances.

For the foregoing reasons, Plaintiffs respectfully submit that they have stated in Counts 5, 8, 11, 26, 29, 30, and 31 of their First Amended Complaint claims upon which relief can be granted.

### C. Counts 4, 7, 10, 24, 25, and 28: Charleston's handgun sales ordinances are unconstitutional under W.Va. Const. Art. III, § 22.

Each of the Charleston handgun sales ordinances challenged in this action is an overly broad regulation that impermissibly frustrates an individual's exercise of his or her right to keep and bear arms under W.Va. Const. Art. III, § 22.

> Article III, section 22 of the West Virginia Constitution was approved by the voters of this State on November 4, 1986, and succinctly states: "A person has the right to keep and bear arms for the defense of self, family, home and state, and for lawful hunting and recreational use."

*State ex rel. City of Princeton v. Buckner*, 180 W.Va. 457, 459, 377 S.E.2d 139, 141 (1988). "The right to keep arms necessarily involves the right to purchase them[.]" *Andrews v. State*, 50 Tenn. 165, 178 (1871); *see also* Stephen P. Halbrook, *Rationing Firearms Purchases and the Right to Keep Arms: Reflections on the Bills of Rights of Virginia, West Virginia, and the United States*, 96 W.Va. L. Rev. 1 (1993).

The restrictions imposed by the challenged ordinances—rationing handgun sales, mandatory waiting periods, mandatory registration, and additional restrictions on the categories of individuals who may lawfully purchase handguns beyond what longstanding Federal and State laws provide—were completely alien to West Virginia law at the time the West Virginia Right to Keep and Bear Arms Amendment, W.Va. Const. Art. III, § 22, was ratified. Nothing in the Amendment's legislative analysis or advertising materials gave even the slightest hint that the kinds of restrictions imposed by the challenged ordinances would be tolerated. *See* James W. McNeely, *The Right of Who to Bear What, When, and Where—West Virginia Firearms Law v.*

*The Right-to-Bear-Arms Amendment*, 89 W.Va. L. Rev. 1125, 1176-81 (1987) (article cited with approval extensively in *Buckner*).

.Given that First Amendment law is highly persuasive in the analysis of an individual's right to keep and bear arms, *Chester*, 628 F.3d at 682, the challenged ordinances are simply indefensible. If, instead of purchasing a handgun, the Charleston Defendants chose to impose a 72-hour waiting period, one-time-per-month (with discretionary authority invested in the chief of police to grant an individual a special waiver for up to three other occasions within a particular month) limitation, and compulsory registration with the city police prior to publishing an editorial, column, or letter to the editor in the *Charleston Gazette* or *Charleston Daily Mail* critical of Defendants' policies; purchasing or selling certain books; attending or conducting political meetings; or attending or conducting religious services, Plaintiffs are certain that this Honorable Court would not tolerate them for one minute. These examples are such clear violations of every person's freedom of speech, press, assembly, and religion under the West Virginia Constitution that, to Plaintiffs' knowledge, they have not been attempted and thus have not been the subject of an on-point ruling by the West Virginia Supreme Court of Appeals. Yet, when the subject is changed to the acquisition of a constitutionally-protected arm "for the defense of self, family, home and state," W.Va. Const. Art. III, § 22, the Charleston Defendants want this Honorable Court to believe that they may constitutionally exercise such extraordinary prior restraints on an individual's right to keep (not to mention bear) arms.

In its analysis of facial challenges to laws implicating an individual's right to keep and bear arms under W.Va. Const. Art. III, § 22, the West Virginia Supreme Court of Appeals, at a time when the Second Amendment to the United States Constitution was neither regarded as an individual right nor applicable to the states, *Buckner*, 180 W.Va. at 460 n. 6, 377 S.E.2d at 142 n. 6, held that the First Amendment overbreadth doctrine is applicable to laws implicating the right

18

to keep and bear arms and that the court would not attempt to judicially reform or salvage an overbroad law.

> An "overbroad" law, as that term has been developed by the United States Supreme Court, is not vague, or need not be. Its vice is not failure to communicate. Its vice may be clarity. For a law is overbroad to the extent that it announces a prohibition that reaches conduct which may not be prohibited. A legislature can make a law as "broad" and inclusive as it chooses unless it reaches into constitutionally protected ground. The clearer an "overbroad" statute is, the harder it is to confine it by interpretation within its constitutionally permissible reach.

*Id.* at 462, 377 S.E.2d at 144 (citation omitted).

> The facts in this case are uncontroverted. On March 10, 1987, a municipal police officer in the City of Princeton, in Mercer County, stopped a vehicle and arrested the driver for driving under the influence of alcohol. After searching the driver, the policeman discovered a .22 caliber automatic pistol inside the driver's jacket pocket. The driver was then asked to produce a license allowing him to carry such a weapon, and he subsequently advised the police officer that he did not have such a license.

*Id.* at 458-59, 377 S.E.2d at 140-41.  Less than two years later, after the Legislature reformed West Virginia's gun laws in light of *Buckner*, the court affirmed the constitutionality of W.Va. Code § 61-7-3 (1989) (requiring license to carry a *concealed* weapon), holding that

> Article III, Section 22 of the West Virginia Constitution gives a citizen the constitutional right to keep and bear arms; however, there is no corresponding constitutional right to keep and bear **concealed** deadly weapons.

Syllabus Point 1, *Application of Metheney*, 182 W.Va. 722, 391 S.E.2d 635 (1990) (emphasis added).  Had the court chosen to apply the general rule of facial challenges articulated in *Lewis v. Canaan Valley Resorts, Inc.*, 185 W.Va. 684, 691, 408 S.E.2d 634, 641 (1991) ("The challenger must establish that no set of circumstances exists under which the legislation would be valid; the fact that the legislation might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid."), and its federal counterpart, *U.S. v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most

difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."), it clearly would have decided *Buckner* differently, as the unnamed drunk driver was carrying his pistol inside a jacket pocket, which was obviously concealed and thus outside the specific protections of W.Va. Const. Art. III, § 22 under *Metheny*.  Likewise, the court could also have held that W.Va. Const. Art. III, § 22 does not protect the right of a person to carry a loaded pistol while under the influence of alcohol, as the legislative analysis and advertising materials promoting the Right to Keep and Bear Arms Amendment stated that the Amendment did not protect "carrying arms while intoxicated[.]" McNeely, 89 W.Va. L. Rev. at  1149.[6]

In response to Plaintiffs' state and federal constitutional challenges, the Charleston Defendants and *amicus curiae* Brady Center to Prevent Gun Violence, *see* [Doc. 20-1], have presented some interesting arguments in the abstract that may or may not be applicable to the ordinances at issue in this action and the Charleston Defendants' application and administration of them.  However, as we remain at the motion to dismiss stage with a joint motion by all parties to stay discovery pending the resolution of the motions to dismiss pending, *see* [Doc. 25], the purported rationale argued by the Charleston Defendants and the Brady Center is insufficient to dismiss Plaintiffs' state constitutional claims as a matter of law.

Because "the purpose of Rule 12(b)(6) is . . . not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses[,]" *Presley*, 464 F.3d at 483 (internal quotation marks, alterations, and citation omitted), this Honorable Court must, for the foregoing reasons, "construe the facts and reasonable inferences derived therefrom in the light most

---

[6]  Although W.Va. Code § 20-2-57b prohibits hunting while under the influence without regard to type of hunting equipment used, no West Virginia state law currently restricts or prohibits the possession or carrying of firearms or other weapons on the basis of intoxication.  Thus, West Virginia's courts have not been required to address this issue.

favorable to the plaintiff[,]" *Ibarra*, 120 F.3d at 474, and deny the Charleston Defendants' motion to dismiss Plaintiffs' state constitutional claims in Counts 4, 7, 10, 24, 25, and 28 of their First Amended Complaint.

### D. Counts 3, 6, 9, 21, and 27: Charleston's handgun sales ordinances are unconstitutional under U.S. Const. amds. II and XIV.

The Charleston handgun sales ordinances challenged in this action impermissibly delay—and thus deny—an individual's constitutionally-protected right to lawfully purchase a handgun for self-defense both outside and inside the home; quantitatively limit the exercise of an individual's constitutionally-protected right to lawfully purchase a handgun for self-defense both outside and inside the home; deny an individual's right to privacy in the exercise of his or her constitutionally-protected right to lawfully purchase a handgun for self-defense both outside and inside the home; and arbitrarily deny the right of certain classes of individuals to purchase handguns without sufficient evidence that certain classes of individuals are inherently and exceptionally dangerous and without any mechanism for administrative or judicial relief on an individualized basis.  Thus, these ordinances violate Plaintiffs' right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution.

The Second Amendment applies "*most notably* for self-defense within the home," *McDonald v. City of Chicago*, 561 U.S. ___, ___, 130 S.Ct. 3020, 3044 (2010) (emphasis added), "where the need for defense of self, family, and property is most acute[,]" *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008), but it does not end there.[7] "[T]he core right

---

[7] While Plaintiffs have acknowledged that their Second Amendment claims against all three city property carry bans at issue may be adversely affected by *U.S. v. Masciandaro*, ___ F.3d ___, 2011 WL 1053618 (4th Cir. Mar. 24, 2011), *see* [Doc. 26] at 24-25, the panel decision in *Masciandaro* is insufficient to

identified in *Heller* [is] the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense[.]" *Chester*, 628 F.3d at 683.  This case involves law-abiding citizens who are asserting their right to possess and carry handguns for self-defense, not habitual domestic violence offenders as in *Chester* and *U.S. v. Tooley*, 717 F.Supp.2d 580 (S.D. W.Va. 2010), who had clearly-demonstrated histories of violence and whose cases did not deal squarely with the Second Amendment's "core" right to self-defense.

"Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller*, we held that individual self-defense is 'the central component' of the Second Amendment right." *Id.* at ___, 130 S.Ct. at 3036 (*quoting Heller*, 554 U.S. at 599, 628) (footnote omitted). "[I]t is clear that . . . the right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty[,]" *id.* at ___, 130 S.Ct. at 3042, and "this right is deeply rooted in this Nation's history and tradition." *Id.* at ___, 130 S.Ct. at 3036 (internal quotation marks and citation omitted).

As Plaintiffs argued in Part III.C., *supra*, concerning their state constitutional claims, given that First Amendment law is highly persuasive in the analysis of an individual's right to keep and bear arms, *Chester*, 628 F.3d at 682, the challenged ordinances are simply indefensible. If, instead of purchasing a handgun, the Charleston Defendants chose to impose a 72-hour waiting period, one-time-per-month (with discretionary authority invested in the chief of police to grant an individual a special waiver for up to three other occasions within a particular month) limitation, and compulsory registration with the city police prior to publishing an editorial, column, or letter to the editor in the *Charleston Gazette* or *Charleston Daily Mail* critical of Defendants' policies; purchasing or selling certain books; attending or conducting political

---

dismiss Plaintiffs' Second Amendment claims against the Charleston handgun sales ordinances, which implicate Plaintiffs' right to acquire handguns that may be used in their homes as well as outside.

meetings; or attending or conducting religious services, Plaintiffs are certain that this Honorable Court would not tolerate them for one minute.  These examples are such clear violations of every person's freedom of speech, press, assembly, and religion under the First Amendment that, to Plaintiffs' knowledge, they have never been attempted and thus have not been the subject of any on-point legal precedent.  Yet, when the subject is changed to the acquisition of a constitutionally-protected arm for self-defense as recognized by *Heller* and *McDonald*, the Charleston Defendants want this Honorable Court to believe that they may constitutionally exercise such extraordinary prior restraints on an individual's right to keep (not to mention bear) arms.

Facial challenges to a statute or regulation based on overbreadth are recognized in a number of different settings, including but not limited to the First Amendment. *See Sabri v. United States*, 541 U.S. 600, 610 (2004) (collecting cases). *See also Chester*, 628 F.3d at 682 (First Amendment a guide in developing standards of review for the Second Amendment). The overbreadth doctrine should apply to constitutional challenges involving the Second Amendment just as West Virginia's courts apply it to W.Va. Const. Art. III, § 22. *Buckner*, 180 W.Va. at 462, 377 S.E.2d at 144.

Because Plaintiffs are among the class of "law-abiding, responsible citizen[s,]" *Chester*, 628 F.3d at 683, who enjoy the highest level of protection of their individual right to keep and bear arms and the right to keep and bear arms is a fundamental right, *McDonald*, 561 U.S. at ___, 130 S.Ct. at 3036, 3042; *Heller*, 554 U.S. at 599, 628, Plaintiffs submit that their Second Amendment claims against Charleston's handgun sales ordinances must be analyzed under strict scrutiny. *Chester* explained that where applicable, the means-ends standard of review in Second Amendment cases is either strict or intermediate scrutiny, depending on the nature of the claim

asserted. 628 F.3d at 682. "[C]lassifications affecting fundamental rights are given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (internal citation omitted). Because Plaintiffs are among the class of "law-abiding, responsible citizen[s,]" *Chester*, 628 F.3d at 683, who enjoy the highest level of protection of their individual right to keep and bear arms, *Chester's* holding adopting intermediate scrutiny for a challenge to the federal prohibition on possession of firearms by domestic violence misdemeanants is inapposite. To withstand the strict scrutiny analysis, Defendants must prove that they have a compelling interest that relates to the restriction at issue and must demonstrate that they has narrowly tailored the challenged ordinance so as to minimize the burden on Plaintiffs' rights while furthering that compelling interest. *E.g., Abrams v. Johnson*, 521 U.S. 74, 82 (1997). While public safety may be a compelling interest, Charleston's handgun sales ordinances serve only to hinder the most "law-abiding, responsible citizen[s,]" *Chester*, 628 F.3d at 683, from exercising their right to keep and bear arms and is certainly not narrowly tailored. The Charleston Defendants cannot meet their burden under the Constitution.

Even if intermediate scrutiny is applicable, "the government must demonstrate . . . that there is a reasonable fit between the challenged regulation and a substantial government objective." *Chester*, 628 F.3d at 683 (internal quotation marks and citations omitted). It is the Defendants' burden to prove that the ordinance furthers public safety. *See Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1082 (4th Cir. 2006). Regardless of the level of scrutiny, the Charleston Defendants cannot meet their burden under the Constitution.

As one example of less-restrictive measures the Charleston Defendants have disregarded, any other jurisdictions that have more extensive regulations on handgun sales than prescribed by federal law exempt individuals who are licensed under state law to carry concealed handguns

from various handgun sales laws.[8]   Under 18 U.S.C. § 922(t)(3)(A), individuals licensed under state law to carry concealed handguns in 18 states are authorized to purchase or receive firearms from licensed dealers without having to undergo the standard NICS check at the time of purchase.   Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Permanent Brady Permit Chart*, http://www.atf.gov/firearms/brady-law/permit-chart.html (last updated April 21, 2011). While most of these states either have no state background check laws or exempt licensed individuals from their respective state laws, some of the states that exempt licensed individuals from their respective state laws have not qualified for the federal background check exemption. Plaintiffs note, despite WVCDl's efforts, *see generally*, 2011 W.Va. House Bill 3125; 2011 W.Va. Senate Bill 543; WVCDL, *West Virginia Gun Owner Protection Act of 2011*, http://www.wvcdl.org/WVCDLbills/WVGOPA2011.html (last accessed May 2, 2011), while West Virginia is not among the 18 states that enjoy the federal firearm purchase background check exemption under 18 U.S.C. § 922(t)(3)(A), Plaintiffs are most interested in knowing what

---

[8]   Conn. Stat. §§ 29-28, 29-33(b), (e), and 29-37a (exempting individuals licensed to carry handguns from various firearm sale regulations); 11 Del. Code. § 1448A(j)(5) (exempting individuals licensed to carry concealed weapon from state firearm purchase background check); Fla. Const. Art. I, § 8(b) (exempting person licensed to carry concealed weapons from statewide 3-day handgun purchase waiting period); Fla. Const. Art. VIII, § 5(b) (exempting person licensed to carry concealed weapons from local option 5-day firearm purchase waiting period); Fla. Stat. § 790.065(1) (exempting person licensed to carry concealed weapons from state firearm purchase background check); Fla. Stat. § 790.065(2)(a) (same as Fla. Const. Art. I, § 8(b)); Iowa Code §§ 724.15(2)(d), 16 (exempting individual holding permit to carry from state requirement of permit to acquire a handgun); Mich. Comp. Laws § 28.422a (exempting individuals licensed to carry concealed pistols from requirement of license to purchase a pistol); Minn. Stat. § 624.7131 subd. 9 (exempting individuals holding permit to carry from transferee permit requirement); Neb. Rev. Stat. § 69-2403(2)(f) (2010) (exempting concealed handgun permit holder from state handgun purchase permit requirement; N.C. Gen. Stat. § 14‑402(a)(ii) (exempting concealed handgun permit holder from state handgun purchase permit requirement); 18 Pa. Con. Stat. § 6111(f)(3) (exempting individuals licensed to carry firearms from certain firearm sale requirements); R.I. Gen. Law § § 11-47-35.1 (exempting individuals licensed to carry concealed handguns from state handgun purchase waiting period, background check, and safety course);Utah Code § 76-10-526(13) (exempting concealed firearm permit holder from state firearm purchase background check requirement); Va. Code § 18.2-308.2:2(P)(2)(h) (exempting concealed handgun permit holders from one handgun per month purchase limit); Wa. Rev. Code § 9.41.090(1) (exempting concealed pistol license holders from state background check and waiting period to purchase a pistol).

the Charleston Defendants are doing that the sheriff is not doing during the 45-day background check required by W.Va. Code § 61-7-4(b) and (f) that could possibly justify subjecting them to redundant, time-consuming, and unnecessary background checks that could more easily be accomplished by other means. Moreover, had the Charleston Defendants chosen at almost any time over the last 18 years to follow the lead of the states that exempt concealed handgun license holders from their respective state handgun sale laws, they might have been able to avoid the bulk of this action in the first place, as the individual plaintiffs all have concealed handgun licenses and thus would have been exempted from the challenged ordinances and lacked standing to sue.[9]   However, despite published reports, e.g., Lawrence Messina, *Troopers Say Manpower Lacking*, Charleston Gazette, Nov. 19, 2008, at A1 ("'concealed weapon permit holders are law-abiding citizens that we generally don't have as defendants in criminal cases,' [West Virginia State Police Deputy Superintendent Steve] Tucker said"), the Charleston Defendants choose to paint with a very broad brush and treat even those individuals who have concealed handgun licenses as criminals-in-waiting who deserve to be restrained in their exercise of their right to keep and bear arms.

In Count 3 of their First Amended Complaint, Plaintiffs are challenging Charleston's handgun rationing scheme under Charleston City Code §§ 18-422, 424(b), 425(1), and 428. These ordinances impermissibly ration the exercise of a constitutionally-protected right.  The statements Charleston City Code § 18-425(1) requires Plaintiffs to make as a prerequisite to lawfully purchasing a handgun under the challenged ordinances subjects a prospective purchaser to potential derivative criminal liability under 18 U.S.C. §§ 922(a)(6) and 924(a)(1) and W.Va. Code § 61-7-10(f) (2010).  If the Charleston Defendants are concerned about alleged "gun-

---

[9] Although the individual plaintiffs named in this action have concealed handgun licenses, WVCDL is without sufficient information to admit or deny whether every other WVCDL member holds a current, valid West Virginia concealed handgun license.

running" by straw purchasers, they have a more than adequate array of effective remedies under Federal law. See 18 U.S.C. §§ 922(a)(5)-(6) and 924(a)(1).  A mere generalized "[f]ear of serious injury cannot alone justify suppression of [constitutionally-protected rights]." *U.S. v. National Treasury Employees Union*, 513 U.S. 454, 475 (1995) (citation omitted). "The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications." *McDonald*, 561 U.S. at ___, 130 S.Ct. at 3045.

In Count 6 of their First Amended Complaint, Plaintiffs are challenging the 72-hour mandatory waiting period for the purchase of a handgun specified by Charleston City Code § 18-426. The loss of Second Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Cf. Elrod*, 427 U.S. at 373.  This ordinance cannot be justified on the grounds that it is somehow necessary to complete the background checks otherwise required by other city ordinances, as the ordinance makes no provision for reducing or waiving the mandatory waiting period if the background check is completed before 72 hours have expired. *See* Charleston City Code § 18-424(c) (exception to 72-hour waiting period solely for gun show sales).  Moreover, the background checks required by other city ordinances would seem to be redundant in light of the Federal background check requirements of 18 U.S.C. § 922(t).  Plaintiffs are most curious about what the Charleston Defendants are doing that is not already being accomplished by Federal law.  Moreover, if the Charleston Defendants are in possession of information about individuals who are prohibited by Federal and State law from purchasing handguns, why is that information not already being provided to the Federal Bureau of Investigation for inclusion in the National Instant Criminal Background Check System so that those individuals might be prevented from unlawfully purchasing firearms from dealers located outside the City of Charleston?  Unfortunately, Plaintiffs believe and intend to demonstrate that

Charleston's 72-hour waiting period was designed and operates as an intentional hindrance to lawful handgun purchases that is simply not permitted by the Second Amendment.

In Count 9 of their First Amended Complaint, Plaintiffs are challenging Charleston's handgun sale registration requirement as a violation of their right to privacy in the exercise of their Second Amendment right to keep and bear arms.  Because an individual's right to keep and bear arms is "among those fundamental rights necessary to our system of ordered liberty[,]" *McDonald*, 561 U.S. at ___, 130 S.Ct. at 3042, and "is deeply rooted in this Nation's history and tradition," *id.* at ___, 130 S.Ct. at 3036 (internal quotation marks and citation omitted), and "[t]he Constitution recognizes a right of privacy with respect to those rights regarded as 'fundamental' or 'implicit in the concept of ordered liberty[,]'" *Lovisi v. Slayton*, 539 F.2d 349, 351 (4th Cir. 1976) (*en banc*) (citation omitted), Plaintiffs enjoy a constitutionally-protected right to privacy in the exercise of their Second Amendment right to purchase handguns. In *National Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462-63 (1958), the Supreme Court held that under the First Amendment, a vital relationship exists between freedom to associate and privacy in one's associations and that the compulsory disclosure of engagement in a constitutionally-protected activity impermissibly interfered with an individual's right to engage in that activity.  *See also, e.g., Davis v. Federal Election Commission*, 554 U.S. 724, 744 (2008). Plaintiffs have the same right to protect their lawful firearm purchases from the prying eyes of the Charleston Defendants as the NAACP did to protect its membership list from the State of Alabama.[10]

---

[10]    In fact, there is no clear assurance that circulation of the handgun registration records maintained by the Charleston Defendants can be limited only to the Charleston Defendants.  The West Virginia Freedom of Information Act, W.Va. Code §§ 29B-1-1 *et seq.*, appears to subject these records to mandatory disclosure to any person, at any time, with no notice to or recourse by an individual handgun owner.  Even if the Charleston Defendants wanted to take additional steps to guarantee the privacy of

In Counts 21 and 27 of their First Amended Complaint, Plaintiffs are challenging Charleston's classifications of individuals prohibited from purchasing handguns only to the extent those classifications are broader than 18 U.S.C. § 922(g) and (n) and W.Va. Code § 61-7-7.  Plaintiffs do not challenge in this action any of the classifications in 18 U.S.C. § 922(g) or (n) or W.Va. Code § 61-7-7 nor the classifications adopted by the Charleston Defendants that correspond to those Federal and State laws.  Although Plaintiffs anticipate the Charleston Defendants will attempt to adduce some evidence to sustain their classifications, any arguments regarding the permissibility of those classifications under the Second Amendment would be better resolved at the summary judgment stage.  "The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications." *McDonald*, 561 U.S. at ___, 130 S.Ct. at 3045.

For the foregoing reasons, Plaintiffs respectfully submit that they have stated in Counts 3, 6, 9, 21, and 27 of their First Amended Complaint claims upon which relief can be granted.

### *E. Counts 12 through 15: the Charleston Defendants are violating*

### *Section 7 of the Privacy Act of 1974.*

Plaintiffs' claims in Counts 12 through 15 of their First Amended Complaint are straightforward.  The Charleston Defendants are currently—and have long been—running roughshod over Section 7 of the Privacy Act of 1974, Public Law 93-579, § 7, 88 Stat. 1896, 1909 (1974), *reprinted in* 5 U.S.C. § 552a note, by requiring a handgun purchaser to disclose his or her Social Security account number (Count 12), failing to inform a prospective handgun purchaser whether the disclosure of his or her Social Security account number is mandatory or

---

these records, they plainly lack the authority to do so, as the West Virginia Freedom of Information Act is a uniform, statewide, general law that only the Legislature can amend.

voluntary (Count 13), failing to inform a prospective handgun purchaser by what statutory or other authority his or her Social Security account number is solicited (Count 14), and failing to inform a prospective handgun purchaser what uses will be made of the purchaser's Social Security account number (Count 15).

> (a)(1) It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number.
>
> (2) the provisions of paragraph (1) of this subsection shall not apply with respect to—
>
> (A) any disclosure which is required by Federal statute, or
>
> (B) the disclosure of a social security number to any Federal, State, or local agency maintaining a system of records in existence and operating before January 1, 1975, if such disclosure was required under statute or regulation adopted prior to such date to verify the identity of an individual.
>
> (b) Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it.

Section 7, Privacy Act of 1974, Public Law 93-579, § 7, 88 Stat. 1896, 1909 (1974), *reprinted in* 5 U.S.C. § 552a note.

> Whoever. . . discloses, uses, or **compels the disclosure of the social security number of any person in violation of the laws of the United States**; shall be guilty of a felony and upon conviction thereof shall be fined under title 18 or imprisoned for not more than five years, or both.

42 U.S.C. § 408(a)(8) (emphasis added).  Section 7 of the Privacy Act is applicable to all state and local governments and the Federal courts have jurisdiction to grant declaratory and injunctive relief, costs, and attorney's fees. *See Greidinger v. Davis*, 988 F.2d 1344 (4th Cir. 1993). The purpose of the Privacy Act of 1974 was "to curtail the expanding use of social security numbers by federal and local agencies and, by so doing, to eliminate the threat to individual privacy and confidentiality of information posed by common numerical identifiers."

*Doyle v. Wilson*, 529 F.Supp. 1343, 1348 (D. Del. 1982). "Due to the federal legislative scheme involving the use of [Social Security account numbers], [individuals] have a legitimate expectation of privacy in their [Social Security account numbers]." *State ex rel. Beacon Journal Publishing Co. v. Akron*, 70 Ohio St.3d 605, 609, 640 N.E.2d 164, 167 (1994).  Finally, Mr. & Mrs. Morgan's claims seeking expungement of records held by the Charleston Defendants containing unlawfully-compelled Social Security account number disclosures ("any other further relief to which Plaintiffs may be entitled as this Honorable Court deems just and appropriate") is valid. *See Camp v. Cason*, 220 Fed.Appx. 976, 982 (11th Cir. 2007).

For the foregoing reasons, Plaintiffs respectfully submit that they have stated in Counts 12 through 15 of their First Amended Complaint claims upon which relief can be granted.


### F. Counts 32 through 34: the Charleston city property carry ban is
### unauthorized by statute or, in the alternative, overbroad and constitutional.

Because the operative provisions of Charleston City Code § 78-165 challenged in this action are substantially similar to Dunbar City Code § 545.13 and South Charleston City Code § 545.15, which Plaintiffs are also challenging in this action, and the arguments made by the Charleston Defendants, [Doc. 17], are virtually identical to those made by the South Charleston and Dunbar defendants, [Docs. 21 and 22], Plaintiffs' counterarguments are also identical.  Thus, Plaintiffs spare this Honorable Court and opposing parties and counsel the redundancy of restating their arguments here and instead incorporate by reference their arguments in [Doc. 26], Part III, and [Doc. 27], Part III.

Furthermore, for the purposes of Plaintiffs' constitutional challenges in Counts 32 and 33 of their First Amended Complaint, Plaintiffs add that Charleston City Code § 78-165 suffers

from the additional infirmity of being a even more broad, absolute prohibition on carrying a firearm on literally any real property owned or occupied by the City of Charleston and not merely city buildings and parks, as are covered by the South Charleston and Dunbar ordinances. Given the breadth of Charleston City Code § 78-165 and the Charleston Defendants' overt hostility to the rights of law-abiding gun owners manifested by Charleston's entire body of ordinances unduly restricting the acts of law-abiding gun owners in the city, Plaintiffs wish to underscore the danger that is presented by the potential interpretation of W.Va. Code § 8-12-5(16) advocated by all Defendants.  The Charleston Defendants have done nothing to suggest that there is any legal activity relating to the ownership, possession, or carrying of handguns that they do not desire to prohibit—or at least heavily restrict.

Finally, as it relates to Plaintiffs' constitutional challenges to Charleston City Code § 78-165, Plaintiffs have a simple response to the public commentary of Defendant Danny Jones following the initial filing of this action.

> [Charleston Mayor Danny] Jones noted the lawsuit was filed in the Charleston federal courthouse where firearms are prohibited.
>
> "All we want is what they have. We want to be able to control our own property," Jones said. "I don't know how far these people want to go."

Associated Press, *Lawsuit challenges city gun laws*, Charleston Daily Mail, Jan. 25, 2011.  If all that Mayor Jones and the other Charleston Defendants wanted was the same arrangement as the courthouse in which this Honorable Court sits, there would be little argument from Plaintiffs.  As Plaintiffs have previously stated, [Doc. 26} at 21-23,

> WVCDL has advocated legislation, based in part upon Col. Rev. Stat. § 18-12-214(4) (2003), that would authorize any state or local government agency—including Defendants—to restrict or prohibit the possession or carrying of weapons in a "secure restricted access area" of any public building where specified security measures are in place.  *See generally*, 2011 W.Va. House Bill 3125; 2011 W.Va. Senate Bill 543; WVCDL, *West Virginia Gun Owner*

*Protection Act of 2011*, http://www.wvcdl.org/WVCDLbills/WVGOPA2011.html
(last accessed May 2, 2011).

[Doc. 26] at 22.  Unfortunately, a reasonable, narrowly-tailored regulation that not only prohibits the otherwise lawful carrying of firearms but actually backs it with meaningful security measures to provide real protection to the alleged protected persons and effectively interdict unlawfully-carried weapons is not what Charleston has or desires.  The Charleston Defendants instead seek universal citizen disarmament everywhere they think they can possibly do so, comfortable in the knowledge that they have no legal duty to protect anyone even though. Not a single criminal or madman is going to be deterred by the prospect of 30 days in jail and a $500 fine on top of decades in prison for multiple felony convictions for whatever evil crimes might someday be committed—which, in the absence of the types of security measures that protect this Honorable Court, Plaintiffs can only hope and pray never befalls their fellow West Virginians who visit and work in or on the numerous, unsecure, public properties covered by Charleston's overbroad carry ban—in Charleston's archipelago of criminal protection zones.

For the foregoing reasons, Plaintiffs respectfully submit that they have stated in Counts 32 through 34 of their First Amended Complaint claims upon which relief can be granted.

### G. Other claims.

Plaintiffs' other claims contained in Counts 16, 17, 18, 19, 20, 22, 23, and 25 of their First Amended Complaint speak for themselves.  Plaintiffs respectfully submit that Counts 16, 17, 18, 19, 20, 22, 23, and 25 of the First Amended Complaint state claims upon which relief can be granted

## IV. CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Honorable Court deny the Charleston Defendants' pre-answer motion to dismiss and direct the Charleston Defendants to answer Plaintiffs' First Amended Complaint pursuant to Fed. R. Civ. P. 12(a)(4)(A).  Alternatively, Plaintiffs request leave to file a further Amended Complaint should this Honorable Court find any insufficiency in their First Amended Complaint.

Dated this 5th day of May, 2011,


    s/ James M. Mullins, Jr.
James M. Mullins, Jr.          (WV State Bar # 11129)
       Attorney for All Plaintiffs
The Law Offices of James M. Mullins, Jr., PLLC
101 North Kanawha Street, Suite 401
Beckley, WV 25801
Telephone: 304-929-3500 (o)/304-687-5492 (c)
FAX: 304-929-3503
E-mail: jim@mullinslawoffices.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2011, I electronically filed the foregoing document with the Clerk of the Court, which will send electronic notification of such filing to the following CM/ECF participants:

Webster J. Arceneaux, III
Spencer D. Elliott
Lewis Glasser Casey & Rollins, PLLC
PO Box 1746
Charleston, WV 25326
Attorneys for City of Charleston, Jack Yeager, and Earl Whittington

W. Michael Moore
Alicia A. Deligne
Moore & Biser PLLC
317 Fifth Avenue
South Charleston, WV 25303
Attorneys for City of South Charleston, Frank Mullens, and Brad Rinehart

Benjamin L. Bailey
Ricklin Brown
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
Attorneys for City of Charleston, Danny Jones, and Brent Webster

Ashley W. French
Huddleston Bolen LLP
PO Box 3786
Charleston, WV 25337
Attorney for *amicus curiae* Brady Center to Prevent Gun Violence


     s/ James M. Mullins, Jr.
James M. Mullins, Jr.      (WV State Bar # 11129)
        Attorney for All Plaintiffs
The Law Offices of James M. Mullins, Jr., PLLC
101 North Kanawha Street, Suite 401
Beckley, WV 25801
Telephone: 304-929-3500 (o)/304-687-5492 (c)
FAX: 304-929-3503
E-mail: jim@mullinslawoffices.com