UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

WEST VIRGINIA CITIZENS DEFENSE       *
LEAGUE, INC., et al.,

            Plaintiffs,        *

     v.                                 *
                                 **Civil Action No.:  2:11-cv-0048**

CITY OF CHARLESTON, et al.,           *

            Defendants.       *


                               *

                               *

*   *   *   *   *   *         *   *   *   *   *   *

**BRIEF OF *AMICUS CURIAE* BRADY CENTER TO PREVENT
<u>GUN VIOLENCE IN SUPPORT OF DEFENDANTS</u>**

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................... 1

INTEREST OF *AMICUS* .......................................................................................... 1

ARGUMENT ........................................................................................................... 2

I.     THE CONTESTED REGULATIONS DO NOT VIOLATE THE SECOND AMENDMENT ........................................................................ 2

     A.     The Contested Regulations Do Not Implicate Protected Second Amendment Activity Because They Do Not Impact the Right of Law-Abiding Citizens To Possess Firearms in the Home for the Purpose of Self-Defense. ................................................................ 3

     B.     The Second Amendment Right Should Not Be Extended Beyond the Home Because of the Grave Risks That Guns Pose To Public Safety. ......................................................................................... 6

     C.     Even if the Contested Regulations Did Implicate Protected Second Amendment Activity, the Regulations Are Constitutional Because They Are Reasonable Limitations on the Non-Absolute Second Amendment Right. ...................................................................... 9

          1.     The Reasonable Regulation Test Is the Appropriate Standard of Review Because It Affords States the Deference Necessary to Protect the Public From the Grave Risks Posed by Guns. ................................................................ 9

          2.     The Contested Regulations Survive Both the Reasonable Regulation Test and Intermediate Scrutiny Because the Regulations Are Reasonable and Substantially Related To the Important Government Interest of Public Safety. ................... 12

II.     THE CONTESTED REGULATIONS DO NOT VIOLATE THE WEST VIRGINIA CONSTITUTION ......................................................... 19

     A.     Like the Second Amendment, the Right To Guns Under the West Virginia Constitution Is Not Absolute and Reasonable Regulations of the Right Are Permissible. ....................................................... 19

     B.     The Contested Regulations Are Permissible Because They Are Reasonable and Do Not Frustrate the Guarantees of the West Virginia Constitution. .................................................................. 20

CONCLUSION ...................................................................................................... 20

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Commonwealth v. Robinson*, 600 A.2d 957 (Pa. Super. Ct. 1991)...................................8

*Commonwealth v. Romero*, 673 A.2d 374 (Pa. Super. Ct. 1996) .....................................8

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) ...............................................11

*Dist. of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................. *passim*

*Dorr v. Weber*, 741 F. Supp. 2d 993 (N.D. Iowa 2010) ..................................................4

*Gonzales v. Oregon*, 546 U.S. 243 (2006)...................................................................11

*Gonzalez v. Vill. of W. Milwaukee*, No. 09CV0384, 2010 WL 1904977 (E.D. Wis. May 11, 2010) ..............................................................................................................4

*Heller v. Dist. of Columbia*, 698 F. Supp. 2d 179 (D.D.C. 2010), *appeal docketed*, No. 10-7036 (D.C. Cir. Apr. 2, 2010)................................................................. *passim*

*In re Bastiani*, 881 N.Y.S.2d 591 (2008) ......................................................................5

*In re Factor*, 2010 WL 1753307 (N.J. Super. Ct. App. Div. Apr. 21, 2010) ...................4

*McDonald v. City of Chi., Ill.*, 130 S. Ct. 3020 (2010).......................................... *passim*

*Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009) ..............................................................5

*People v. Aguilar*, No. 1-09-0840, 2011 WL 693241 (Ill. App. Ct. Feb. 23, 2011).......4

*People v. Dawson*, 934 N.E.2d 598 (Ill. App. Ct. 2010) .................................................4

*People v. Yarbrough*, 169 Cal. App. 4th 303 (2008) ...................................................6-7

*Perito v. Cnty. of Brooke*, 215 W. Va 178 (2004) .......................................................19

*Riddick v. United States*, 995 A.2d 212 (D.C. 2010).....................................................5

*Robertson v. City & Cnty. of Denver*, 874 P.2d 325 (Colo. 1994) ...............................10

*Rohrbaugh v. State*, 216 W. Va. 298 (2004).....................................................2, 19, 20

*Schall v. Martin*, 467 U.S. 253 (1984).........................................................................12

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

**CASES continued**

*Sims v. United States*, 963 A.2d 147 (D.C. 2008) ..........................................................5

*State v. Buckner*, 180 W. Va. 457 (1998) ...............................................10, 19, 20

*State v. Cole*, 264 Wis. 2d 520 (2003) ....................................................10, 11, 20

*State v. Comeau*, 448 N.W.2d 595 (Neb. 1989) ..............................................10, 11

*State v. Dawson*, 159 S.E.2d 1 (N.C. 1968).......................................................11

*State v. Hamdan*, 665 N.W.2d 785 (Wis. 2002) ...............................................11

*State v. Knight*, 218 P.3d 1177 (Kan. Ct. App. 2009)........................................4

*Teng v. Town of Kensington*, No. 09-cv-8-JL, 2010 WL 596526 (D.N.H. Feb. 17, 2010) ............4

*Trinen v. City of Denver*, 53 P.3d 754 (Colo. Ct. App. 2002) ...............................11

*United States v. Barton*, 633 F.3d 168 (3d Cir. 2011) ...............................6, 18

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)........................2, 10, 11

*United States v. Hart*, 725 F. Supp. 2d 56 (D. Mass. 2010) ..............................4

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)................................. *passim*

*United States v. Masciandaro*, ___ F.3d ___, No. 09-4839, 2011 WL 1053618 (4th Cir. Mar. 24, 2011)..........................................................................*passim*

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009)........................................18

*United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010)........................................6, 18

*United States v. Scroggins*, 599 F.3d 433 (5th Cir. 2010) ....................................18

*United States v. Skoiens*, 614 F.3d 638 (7th Cir. 2010), *cert. denied*, ___ S. Ct. ___, No. 10-7005, 2011 WL 941018 (US. Mar. 2011)..............................................12, 18

*United States v. Tooley*, 717 F. Supp. 2d 580 (S.D. W. Va. 2010)................................4

*United States v. Vongxay*, 594 F.3d 111 (9th Cir.), *cert denied*, 131 S. Ct. 294 (2010)...............18

*United States v. White*, 593 F.3d 1199 (11th Cir. 2010).........................................18

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010).....................................12, 18

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

**TABLE OF AUTHORITIES (continued)**

Page(s)

**CASES continued**

*Williams v. State*, 417 Md. 479 (2011) ..................................................................4

**CONSTITUTIONAL PROVISIONS**

First Amendment ..................................................................9, 10

Second Amendment ..................................................................*passim*

United States Constitution ..................................................................1

W. Va. Const. art. 3, § 22 ..................................................................*passim*

**FEDERAL STATUTES**

18 U.S.C. § 922(g)(1) ..................................................................18

18 U.S.C. § 922(g)(3) ..................................................................18

18 U.S.C. § 922(g)(9) ..................................................................18

18 U.S.C. § 922(n) ..................................................................19

18 U.S.C. § 922(t) ..................................................................17

**STATE STATUTES**

Charleston City Code § 18-421 ..................................................................6, 18

Charleston City Code § 18-421--428 ..................................................................2

Charleston City Code § 18-421—428, 78-163--164 ..................................................................14

Charleston City Code § 78-163--164 ..................................................................2

Charleston City Code § 78-165 ..................................................................2, 13

S. Charleston City Code § 545.15 ..................................................................2, 13

Dunbar City Code § 545.13 ..................................................................2, 13

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

**TABLE OF AUTHORITIES (continued)**

Page(s)

**REGULATION**

36 C.F.R. § 24(b) ...........................................................................................13


**OTHER AUTHORITIES**

Michael Bowling et al., Department of Justice Bureau of Statistics, "Background Checks
for Firearms Transfers, 2009-Statistical Tables" (Oct. 2010), *available at*
*http://bjs.ojp.usdoj.gov/content/pub/html/bcft/2009/bcft09st.pdf* ...........................................17

Bureau of Alcohol, Tobacco, and Firearms, *Crime Gun Trace Reports (2000)*, National
Report (July 2002) ...........................................................................................16

CDC National Center for Injury Prevention and Control, *Web-based Injury Statistics
Query and Reporting System*, *available at*
http://www.cdc.gov/injury/wisqars/index.html (last visited Apr. 15, 2011) ............................1

Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun
Assault*, Am. J. Pub. Health, Vol. 99, No. 11 (Nov. 2009).........................................................8

S. Richard-Devantov et al., "Risk of Homicide and Major Mental Disorders:  a critical
review," Encephale (2009)...........................................................................................18

Christopher Koper, Crime Gun Risk Factors:  Buyer, Seller, Firearm, and Transaction
Characteristics Associated with Gun Trafficking and Criminal Gun Use:  Report to
the National Institute of Justice, Philadelphia, PA:  Jerry Lee School of Criminology
(2007)...........................................................................................16

D.W. Webster et al., *Relationship between licensing, registration, and other gun sales
laws and the source state of crime guns,* Injury Prevention (2001).........................................15

David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 Accident Analysis
& Prevention 807-14 (2002) ...........................................................................................9

David Hemenway & Deborah Azrael, The Relative Frequency of Offensive and
Defensive Gun Uses:  Results from a National Survey, 15 Violence & Victims 257
(2000)...........................................................................................7

David McDowall et. al., *Easing Concealed Firearms Laws: Effects on Homicide in Three
States*, 86 J. Crim. L. & Criminology 193 (1995)....................................................................8

Douglas Weil & Rebecca Knox, "Effects of Limiting Handgun Purchases on Interstate
Transfer of Firearms," JAMA 275 (1996) ...........................................................................16

**TABLE OF AUTHORITIES (continued)**

Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, The Econ. of Gun Control 473 (May 1998)..................8

**Page(s)**

**OTHER AUTHORITIES continued**

James M. La Valle, "Re-Estimating Gun-Policy Effects According to a National Science Academy Report:  Were Previous Reports of Failure Pre-Mature?" J. of Crime & Justice 33(1) (2010) ..................................................................................17

James M. La Valle, "Rebuilding at Gunpoint: A City-Level Re-Estimation of the Brady Law and the RTC Laws in the Wake of Hurricane Katrina," Crim. Justice Pol'y Rev. 18 (2007)..................................................................................................17

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 Int'l Rev. L. & Econ. 239 (1998).....................................................8

John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 Fordham L. Rev. 623 (2004) ............................................................................................8

John J. Donohue, *The Impact of Concealed-Carry Laws*, in Evaluating Gun Policy Effects on Crime & Violence 289 (2003) ............................................................. 7-8

Mona Wright et al., "Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances That Suggest Trafficking," J. of Urban Health Bulletin of the N.Y. Academy of Med., Mar. 31, 2010 ..........................................................16

Mona Wright & Garen Wintemute, *Felonious or Violent Criminal Activity That Prohibits Gun Ownership Among Prior Purchasers of Handguns:  Incidence and Risk Factors*, J. of Trauma, Injury, Infection, & Critical Care (2010)............................................18

Philip Cook et al., *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041 (2009)..................................................8

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, J. Pub. Econ. 379 (2006)..................................................................................................................9

S.A. Sumner et al., *Firearm Death Rates and Association with Level of Firearm Purchase Background Check*, 35 Am. J. Prev. Med. 1 (2008) ................................17

R. Van Dorn et al., "Mental Disorder and Violence:  is there a relationship beyond substance abuse?" Soc. Psychiatry Epidemiology (2011) .......................................18

Violence Policy Center, *Concealed Carry Killers* (2011), *available at* http://vpc.org/ccwkillers.htm (last visited Apr. 15, 2011).......................................7

## INTRODUCTION

The right to keep and bear arms recognized in *District of Columbia v. Heller* is unique among constitutional rights in the grave risks that it presents. 554 U.S. 570 (2008). Guns are designed to kill, and they often do. Each year, guns are used to kill over 30,000 Americans, to injure almost 70,000 more, and to commit more than 340,000 non-fatal crimes.[1] Although the Supreme Court has held that the Second Amendment protects a limited right of law-abiding citizens to possess a gun in the home for self-defense, the Court has not expanded this narrow right and has never recognized a broader right to possess guns outside the home. Rather, the Court has repeatedly stressed that longstanding prohibitions regarding *who* may carry guns and *where* they may carry them are presumptively lawful.

Plaintiffs allege that various gun regulations enforced by Defendants (collectively, the "Cities") violate the Second Amendment to the United States Constitution and article III, section 22 of the West Virginia Constitution. But Plaintiffs cannot meet their heavy burden to prove that the regulations are unconstitutional. The contested regulations do not implicate protected Second Amendment activity because they do not impact the narrow right recognized by the Supreme Court. And, even if the regulations did implicate the Second Amendment, they are permissible limitations on that non-absolute right because they are reasonable regulations that are substantially related to the important government interest of public safety. The right to guns under the West Virginia Constitution is similarly limited and the regulations are also permissible, reasonable restrictions on that right. As such, this Court must uphold the regulations; Plaintiffs is through the legislative process.

### INTEREST OF *AMICUS*

*Amicus* the Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and

---

[1] Source: CDC National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System, *available at* http://www.cdc.gov/injury/wisqars/index.html. Calculations by Brady Center, 6/4/2010.

legal advocacy.  Through its Legal Action Project, the Brady Center has filed numerous briefs *amicus curiae* in cases involving both state and federal gun laws.  The Brady Center brings a broad and deep perspective to the issues raised by this case and has a compelling interest in ensuring that Second Amendment litigation does not impede reasonable governmental action to prevent gun violence.

## ARGUMENT

Plaintiffs claim that three kinds of regulations enforced by the Cities violate the Second Amendment and the West Virginia Constitution: (1) the city of Charleston's handgun sales ordinances, Charleston City Code §§ 18-421—428 (Counts 3-4, 6-7, 9-10, 21, 24, 27-28); (2) Charleston's license requirements, Charleston City Code §§ 78-163—164 (Counts 16-19); and (3) municipal property carrying restrictions of Charleston, South Charleston, and Dunbar, Charleston City Code § 78-165, South Charleston City Code § 545.15, and Dunbar City Code § 545.13 (Counts 32-33, 35-36, 38-39).

Legislative enactments are presumed to be constitutional, and it is Plaintiffs' heavy burden to rebut this presumption and prove beyond a reasonable doubt that the regulations are unconstitutional. *Rohrbaugh v. State*, 216 W. Va. 298, 306 (2004).  Plaintiffs cannot meet their burden.  The contested regulations do not violate either the Second Amendment or the West Virginia Constitution.

## I.  THE CONTESTED REGULATIONS DO NOT VIOLATE THE SECOND AMENDMENT

Following the Supreme Court's decisions in *District of Columbia v. Heller* and *McDonald v. City of Chicago*, Illinois, 130 S. Ct. 3020 (2010), courts have applied a two-part analysis to determine whether regulations violate the Second Amendment. *See, e.g., United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).  First, courts determine "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Chester*, 628 F.3d at

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

680 (internal quotation omitted).  If not, the regulation is constitutional and the analysis ends.  *Id.* If the regulation does implicate the Second Amendment, courts then evaluate the regulation under some form of means-end scrutiny.  *Id.*  If the regulation passes the appropriate standard, it is constitutional.  *Id.*

The contested regulations pass both parts of this analysis.

**A.    The Contested Regulations Do Not Implicate Protected Second Amendment Activity Because They Do Not Impact the Right of Law-Abiding Citizens To Possess Firearms in the Home for the Purpose of Self-Defense.**

In *Heller*, the Supreme Court held that the Second Amendment protects the narrow right of responsible, law-abiding citizens to possess a gun in the home for the purpose of self-defense. 554 U.S. at 635.   The Court explicitly found that the Second Amendment right is "not unlimited," and does not include the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.  Moreover, the Court stressed that its opinion did not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626-27.   The Court specified that it identified these "presumptively lawful regulatory measures" only as a non-exhaustive list of examples.  *Id.* at 627 n.26.  Despite ample opportunity to do so, the Court did not recognize a right to carry guns in public.  Indeed, in approvingly discussing historical limitations on the right to keep and bear arms, the Court noted that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment[.]" *Id.* at 626.  Two years later, the Court "repeat[ed] those assurances" that it had "made [] clear" in *Heller* about the continued validity of "longstanding prohibitions on the possession of firearms." *McDonald*, 130 S. Ct. at 3047.

Just last month, the United States Court of Appeals for the Fourth Circuit explicitly declined to extend the Second Amendment right beyond the home, refusing to "push *Heller*

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

beyond its undisputed core holding." *United States v. Masciandaro*, ___ F.3d ___, 2011 WL 1053618 at *16 (4th Cir. Mar. 24, 2011). The Court held: "On the question of Heller's applicability outside the home environment, we think it prudent to await direction from the Court itself * * * If ever there was an occasion for restraint, this would seem to be it." *Id.* at 16-17. Other courts have exercised similar restraint. *See, e.g., Williams v. State*, 417 Md. 479, 495 (2011) (if the Supreme Court "meant its holding to extend beyond home possession, it will need to say so more plainly."); *People v. Dawson*, 934 N.E.2d 598, 605-06 (Ill. App. Ct. 2010) ("*Heller* specifically limited its ruling to interpreting the amendment's protection of the right to possess handguns in the home, not the right to possess handguns outside of the home in case of confrontation.").[2]

The contested regulations do not infringe the right of law-abiding citizens to possess a gun in the home for self-defense, and thus they do not implicate protected Second Amendment activity. Charleston's license requirements and the cities' municipal property carrying restrictions do not implicate protected Second Amendment activity because, by definition, they

---

[2] *See also State v. Knight*, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009) ("[i]t is clear that the [*Heller*] Court is drawing a narrow line regarding the violations related solely to use of a handgun in the home for self-defense purposes"); *Gonzalez v. Village of W. Milwaukee*, No. 09CV0384, 2010 WL 1904977, at *4 (E.D. Wis. May 11, 2010) ("The Supreme Court has never held that the Second Amendment protects the carrying of guns outside the home."); *United States v. Hart*, 725 F. Supp. 2d 56, 60 (D. Mass. 2010) ("*Heller* does not hold, nor even suggest, that concealed weapons laws are unconstitutional."); *Dorr v. Weber*, 741 F. Supp. 2d 993, 1005 (N.D. Iowa 2010) ("[A] right to carry a concealed weapon under the Second Amendment has not been recognized to date."); *Teng v. Town of Kensington*, No. 09-cv-8-JL, 2010 WL 596526, at *5 (D.N.H. Feb. 17, 2010) ("Given that *Heller* refers to outright 'prohibition on carrying concealed weapons' as 'presumptively lawful,' far lesser restrictions of the sort imposed here (i.e., requiring that Teng complete a one-page application and meet with the police chief to discuss it) clearly do not violate the Second Amendment.") (internal citation omitted); *United States v. Tooley*, 717 F. Supp. 2d 580, 596 (S.D. W. Va. 2010) ("Additionally, possession of a firearm outside of the home or for purposes other than self-defense in the home are not within the 'core' of the Second Amendment right as defined by *Heller*."); *People v. Aguilar*, No. 1-09-0840, 2011 WL 693241, at *6 (Ill. App. Ct. Feb. 23, 2011) ("[T]he decisions in *Heller* and *McDonald* were limited to interpreting the second amendment's protection of the right to possess handguns in the home, not the right to possess handguns outside the home."); *In re Factor*, 2010 WL 1753307, at *3 (N.J. Super. Ct. App. Div. Apr. 21, 2010) ("[T]he United States Supreme Court has not held or even implied that the Second Amendment prohibits laws that restrict carrying of concealed weapons."); *Riddick v. United States*, 995 A.2d 212, 222 (D.C. 2010) (Second Amendment does not "compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined." (quoting *Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008))); *In re Bastiani*, 881 N.Y.S.2d 591, 593 (2008).

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

apply only to the possession of guns outside the home.  Any argument that these regulations implicate the Second Amendment is foreclosed by the Fourth Circuit's recent refusal in *Masciandaro* to extend the Second Amendment right beyond the home.  Moreover, the municipal property carrying restrictions apply only to "sensitive places," and the Supreme Court has repeatedly stressed that such laws are "presumptively lawful." *See Heller*, 554 U.S. at 626-27 & n.26; *McDonald*, 130 S. Ct. at 3047; *see also Marzzarella*, 614 F.3d at 92; *Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009) ("[P]rohibiting firearm possession on municipal property fits within the exception from the Second Amendment for 'sensitive places' that *Heller* recognized.") (vacated and remanded after *McDonald*).

Charleston's handgun sales regulations also do not implicate protected Second Amendment activity.  The Supreme Court has repeatedly made clear that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." *See Heller*, 554 U.S. at 626-27 & n.26; *McDonald*, 130 S. Ct. at 3047.  Lower courts "have upheld registration and licensing requirements in the wake of *Heller*, concluding that because registration requirements only regulate, rather than prohibit[], the possession of firearms, they do not infringe the Second Amendment right." *Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179, 190 (D.D.C. 2010) (internal citations omitted), *appeal docketed*, No. 10-7036 (D.C. Cir. Apr. 2, 2010).  Additionally, Charleston's prohibition of sales to any person with a "record"—defined to include persons either (1) convicted of a violent felony and not pardoned or currently indicted for a crime or (2) treated for mental health during the previous three years and not successfully cleared by the treating physician, Charleston City Code § 18-421—does not implicate the Second Amendment because the Supreme Court has repeatedly made clear that such people are disqualified from the exercise of Second Amendment rights. *See Heller*, 554 U.S. at 626, 635; *McDonald*, 130 S. Ct. at 3047.  Lower courts have recognized that the non-exhaustive list of "presumptively lawful" prohibitions identified in *Heller*, including "possession of firearms by felons and the mentally ill," *Heller*, 554 U.S. at 626,

"regulate conduct outside the scope of the Second Amendment." *Marzzarella*, 614 F.3d at 91. As such, "the Second Amendment affords no protection for the possession of dangerous and unusual weapons, possession by felons and the mentally ill, and the carrying of weapons in certain sensitive places." *Id.* at 92. *See also United States v. Barton*, 633 F.3d 168, *2-3 (3d Cir. 2011) ("the Supreme Court's discussion in *Heller* of the categorical exceptions to the Second Amendment was not abstract and hypothetical; it was outcome-determinative"); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (finding that the language in *Heller* referring "to those 'disqualified from the exercise of Second Amendment rights' . . . suggests that statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment.").

### B.   The Second Amendment Right Should Not Be Extended Beyond the Home Because of the Grave Risks That Guns Pose To Public Safety.

There are profound public safety rationales for restricting the carrying of guns in public. "Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized threat to public order, and is prohibited as a means of preventing physical harm to persons other than the offender." *People v. Yarbrough*, 169 Cal.App.4th 303, 314 (2008) (internal quotations and citations omitted); see also *id.* ( "A person who carries a concealed firearm on his person or in a vehicle, which permits him immediate access to the firearm but impedes others from detecting its presence, poses an imminent threat to public safety."). The Fourth Circuit has recognized that these public safety concerns argue against extending the right to arms:

> This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights. It is not far-fetched to think the *Heller* Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square.

*Masciandaro*, 2011 WL 1053618 at *17. Guns in public pose a number of issues not presented by guns in the home. Three issues are particularly noteworthy.

First, guns in public threaten the safety of a broader range of people. While firearms kept in the home are primarily a threat to their owners, family members, friends, and guests, firearms carried in public are a threat to strangers, law enforcement officers, passersby, and other citizens. Moreover, guns are used "far more often to kill and wound innocent victims than to kill and wound criminals … [and] guns are also used far more often to intimidate and threaten than they are used to thwart crimes." David Hemenway & Deborah Azrael, The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey, 15 Violence & Victims 257, 271 (2000). In the last four years, concealed handgun permit holders have shot and killed at least 11 law enforcement officers and 286 private citizens. Violence Policy Center, *Concealed Carry Killers* (2011), *available at* http://vpc.org/ccwkillers.htm. States have a stronger need to protect their citizens from guns in public than they do from guns in the home.

Second, carrying a gun in public is not an effective form of self-defense and instead increases the odds that one will fall victim to violent crime. Several studies have found that states that broadly allow concealed guns in public "experience increases in violent crime, murder, and robbery[.]" John J. Donohue, *The Impact of Concealed-Carry Laws*, in Evaluating Gun Pol'y: Effects on Crime and Violence 289, 320 (2003). *See also* Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 Int'l Rev. L. & Econ. 239 (1998); David McDowall et. al., *Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. Crim. L. & Criminology 193, 202-203 (1995); Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws*

BRIEF OF AMICUS CURIAE BRADY<br/>CENTER TO PREVENT GUN VIOLENCE

*on Crime*, The Econ. of Gun Control 473 (May 1998); John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 Fordham L. Rev. 623 (2004) ("policies to *discourage* firearms in public may help prevent violence"); Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, Amer. J. Pub. Health, Vol. 99, No. 11 at 1, 4 (Nov. 2009) ("gun possession by urban adults was associated with a significantly increased risk of being shot in an assault"). Similarly, increased gun carrying by potential victims may encourage more criminals to carry guns and to use them more quickly. *See* Philip Cook et al., *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041, 1081 (2009) (Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun.).

Third, guns in public harm society in others ways in which guns in the home do not. When guns are restricted in public, possession of a gun in public creates a reasonable suspicion of danger such that a police office may briefly detain an individual to investigate whether the person is properly licensed. *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. Ct. 1991); *Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996). Law enforcement's ability to protect the public would be greatly restricted if officers were required to presume that all persons carrying a firearm in public were doing so lawfully. Oddly, although far less dangerous behavior would justify investigation, an officer might not have cause to stop or search a person carrying a loaded gun. Law enforcement should not have to wait for a gun to be fired before protecting the public. Additionally, allowing drivers to carry loaded guns may exacerbate the consequences of road rage. *See* David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 Accident Analysis and Prevention 807-14 (2002). And more guns in

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

public may intensify criminal violence.  Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, J. Pub. Econ. 379, 387 (2006).

**C.   Even if the Contested Regulations Did Implicate Protected Second Amendment Activity, the Regulations Are Constitutional Because They Are Reasonable Limitations on the Non-Absolute Second Amendment Right.**

Even if the contested regulations did implicate the Second Amendment, they pass any appropriate level of scrutiny and thus are permissible limitations on the Second Amendment right.  In *Heller* and *McDonald*, the Supreme Court "expressly avoided deciding what level of scrutiny should be applied when reviewing a law burdening the right to keep and bear arms." *Masciandaro*, 2011 WL 1053618, at *10.  As such, lower courts have employed "different types of scrutiny in assessing burdens on Second Amendment rights, depending on the character of the Second Amendment question presented." *Id.* at *11.  Under this approach, courts "take into account the nature of a person's Second Amendment interest, the extent to which those interests are burdened by government regulation, and the strength of the government's justifications for the regulation." *Id.*

**1.   The Reasonable Regulation Test Is the Appropriate Standard of Review Because It Affords States the Deference Necessary to Protect the Public From the Grave Risks Posed by Guns.**

In determining what standard of review to apply in Second Amendment cases, some courts have limited their inquiry to the three choices offered by First Amendment jurisprudence. *See, e.g.*, *Marzzarella*, 614 F.3d at 89 n.4; *Chester*, 628 F.3d at 682-83.  Because the Supreme Court has explicitly rejected "rational basis" review, *Heller*, 554 U.S. at 628 n.27, and implicitly rejected "strict scrutiny," *Masciandaro*, 2011 WL 1053618 at *10, some courts have settled on "intermediate scrutiny." *See, e.g.*, *Marzzarella*, 614 F.3d at 97; *Chester*, 628 F.3d at 682-83.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

But the First Amendment analogy is not apt, as the exercise of the Second Amendment creates unique risks that are clearly more lethal than even the most dangerous speech.

Far more relevant than First Amendment cases are previous decisions considering the regulation of guns. Although an individual right to keep and bear arms is newly-recognized under the Second Amendment, state courts have weighed that right, recognized in state constitutions, against the need to protect the public from gun violence for well over a century. Those courts, representing over forty states, "uniformly" applied the "reasonable regulation" test. *State v. Comeau*, 448 N.W.2d 595, 597 (Neb. 1989); *State v. Cole*, 264 Wis. 2d 520, 537-40 (2003). "Even courts that have found [the] right [to bear arms] to be fundamental have used a reasonableness standard." *Cole*, 264 Wis. at 538. Under this "relatively deferential" test, *Cole*, 264 Wis. at 540, a state "may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that power is reasonable." *Robertson v. City & Cnty. of Denver*, 874 P.2d 325, 328, 333 n.10 (Colo. 1994). For example, under the West Virginia right to keep and bear arms, "[t]he individual's right to keep and bear arms and the State's duty, under it [sic] police power, to make reasonable regulations for the purpose of protecting the health, safety and welfare of its citizens must be balanced." *State v. Buckner*, 180 W. Va. 457, 467 (1998).

The reasonable regulation test is the appropriate standard of review to apply in Second Amendment cases because it affords states the deference necessary to carry out their "cardinal civic responsibilities" to protect the health, safety, and welfare of their citizens. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 342 (2008). States are generally afforded "great latitude" in exercising their police powers, *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006), and the reasonable regulation test recognizes "the state's right, indeed its duty under its inherent police

BRIEF OF AMICUS CURIAE BRADY<br>CENTER TO PREVENT GUN VIOLENCE

- 10 -

power, to make reasonable regulations for the purpose of protecting the health, safety, and welfare of the people." *Comeau*, 448 N.W.2d at 599. Yet the test is not toothless. It is more demanding that rational basis review, in that it "focuses on the balance of the interests at stake, rather than merely on whether any conceivable rationale exists under which the legislature may have concluded the law could promote the public welfare." *Cole*, 264 Wis. at 541. Laws that "eviscerate," *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2002), render "nugatory," *Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002), or result in effective "destruction" of a Second Amendment right, *State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968), must be struck down.

Although the reasonable regulation test is the appropriate standard of review and this Court need not apply any other standard, the contested regulations also easily pass the slightly higher standard of intermediate scrutiny. "A law survives intermediate scrutiny if it is substantially related to an important government interest." *Heller II*, 698 F. Supp. 2d at 185 n.7. *See also Masciandaro*, 2011 WL 1053618 at *12; *Chester*, 628 F.3d at 682-83. In applying intermediate scrutiny, courts first determine the strength of the government interest. *Heller II*, 698 F. Supp. 2d at 190. If the interest is sufficiently important, courts then determine whether the regulation at issue is substantially related to that interest. *Id.* at 191. In answering this second question, courts are "mindful that legislative bodies are far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions." *Id.* (internal quotation omitted). "[I]ntermediate scrutiny, by definition, permits legislative bodies to paint with a broader brush than strict scrutiny." *Id.* (internal quotation omitted). As such, "the degree of fit between the registration scheme and the [government interest] need not be perfect; it must only be substantial." *Id.*

### 2. The Contested Regulations Survive Both the Reasonable Regulation Test and Intermediate Scrutiny Because the Regulations Are Reasonable and Substantially Related To the Important Government Interest of Public Safety.

The contested regulations survive both the reasonable regulation test and intermediate scrutiny. As to the first part of intermediate scrutiny analysis, lower courts have recognized since *Heller* that the government's interest in promoting public safety and reducing gun violence is clearly important. *See United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010), *cert. denied*, ____ S. Ct. ____, No. 10-7005, 2011 WL 941018 (U.S. Mar. 21, 2011) ("no one doubts that the goal of [the regulation], preventing armed mayhem, is an important government objective"); *United States v. Yancey*, 621 F.3d 681, 684 (7th Cir. 2010) (the "broad objective of [the regulation]—suppressing armed violence—is without doubt an important one"); *Heller II*, 698 F. Supp. 2d at 191 ("The court has no trouble concluding that these goals constitute an important government interest."); *Masciandaro*, 2011 WL 1053618 at *15 ("government, after all, is invested with 'plenary power' to protect the public from danger"). Indeed, the Supreme Court has found that the interest of public safety is not only important, but compelling. *See Schall v. Martin*, 467 U.S. 253, 264 (1984) ("[t]he legitimate and compelling state interest in protecting the community from crime cannot be doubted"). As to the second part, the contested regulations are substantially related to this important interest. We address each of the regulations in turn, and also explain why they are plainly reasonable.

Even if the Cities' municipal property carrying restrictions do implicate protected Second Amendment activity, the restrictions are reasonable and substantially related to the important government interest of public safety. The Cities' regulations prohibit the carrying of guns upon municipal public property. *See* Charleston City Code § 78-165, South Charleston City Code §

BRIEF OF AMICUS CURIAE BRADY<br>CENTER TO PREVENT GUN VIOLENCE

545.15, and Dunbar City Code § 545.13. Just last month, the Fourth Circuit found that a similar statute survived intermediate scrutiny. *See Masciandaro*, 2011 WL 1053618 at *15-16. The statute, 36 C.F.R. § 24(b), prohibited carrying or possessing a loaded weapon in a motor vehicle within national park areas across the nation. *Id.* at *2. The court found that the statute's "narrow prohibition" was "reasonably adapted" to promoting public safety, as the legislature "could have reasonably concluded that, when concealed within a motor vehicle, a loaded weapon becomes even more dangerous." *Id.* at *15. Masciandaro's Second Amendment interest was weak, in that he was outside the home and, as "the United States Park Police patrol [the public land at issue], the [legislature] could conclude that the need for armed self-dense is less acute there than in the context of one's home." *Id.* Additionally, the burden on Masciandaro was minimal, as the statute "permit[ted]" park patrons to carry unloaded firearms within their vehicles." *Id.* The court acknowledged "that the need to load a firearm impinges on the need for armed self-defense," but stressed that "intermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question." *Id.*

Plaintiffs offer no reason why a different outcome is justified here. As in *Masciandaro*, Plaintiffs' Second Amendment interest outside the home is weak, if it even exists. And the Cities could have reasonably concluded that banning the carrying of guns by citizens on municipal property is necessary to promote public safety. Plaintiffs argue that they must protect themselves when on municipal property because the carrying restrictions "provide no actual protection of any individuals present [on municipal property], as there are no adequate security measures in place to reliably detect and apprehend individuals violating the ordinance." Complaint ¶ 191. Specifically, Plaintiffs complain that the Cities do not screen visitors to

municipal property to detect unlawful guns. *Id.* But individual security screenings are far from the only way that the Cities might choose to ensure the safety of those on municipal property. Moreover, Plaintiffs fail to allege any actual threat or injury suffered on municipal property related to undetected, unlawful guns.

Charleston's license and registration requirements and handgun sales regulations are also reasonable and substantially related to the interest of public safety, assuming any of those ordinances do actually implicate protected Second Amendment activity. The regulations generally prohibit the carrying of guns without a license or other authorization and impose reasonable conditions for a person to obtain a handgun. *See* Charleston City Code §§ 18-421—428, 78-163—164. Plaintiffs claim that the Second Amendment "prohibits any government from compelling the registration of constitutionally-protected arms, including handguns, and protects . . . the right to own, acquire, and dispose of constitutionally-protected arms, including handguns, in private without the knowledge of the government," Complaint ¶ 109, but *Heller* forecloses this argument. There, the Supreme Court indicated that license and registration requirements are generally permissible when it held that, "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him *to register* his handgun and must *issue him a license* to carry it in his home." *Heller*, 554 U.S. at 635 (emphasis added). Moreover, since *Heller*, lower courts have upheld license and registration requirements at least as burdensome, if not more so, than those at issue here. *See Heller II*, 698 F. Supp. 2d at 188-93 (upholding registration requirements that compelled the registrant to submit fingerprints and two photographs, pay a reasonable fee for a ballistics identification procedure, demonstrate knowledge of the jurisdiction's gun laws, demonstrate adequate vision, complete a minimum of five hours of training, provide information about the registrant's employment history and

intended use of the gun, register no more than one gun per 30 days, re-new the registration every three years, submit to a background check every six years, and notify authorities if the gun is sold, lost, stolen, destroyed, or transferred, or if any of the information submitted to procure the registration changes).  Studies show that licensing and registration laws have made it harder for criminals to obtain firearms, with jurisdictions that have registration and licensing systems keeping more guns sold in-state from being recovered in crimes, such that "these laws have the potential to significantly restrict gun acquisition by high risk individuals through stricter eligibility criteria, safeguards against falsified applications, and increased legal risks and costs associated with illegal gun transfers to proscribed individuals."  D.W. Webster et al., *Relationship between licensing, registration, and other gun sales laws and the source state of crime guns*, Injury Prevention 2001;7:184–189.

Plaintiffs also claim that "no government may impose any numerical limit on the number of firearms any person may possess or purchase at any time," Compliant ¶ 77, but no court has held that there is a constitutional right to amass an arsenal, and Plaintiffs provide no legal authority for their argument and do not explain how Charleston's limit of one handgun purchase every 30 days (with an exemption allowing an additional three handguns in one month with police approval) prevents effective self-defense in the home.  Even if numerical limits do somehow implicate the Second Amendment right to possess a gun in the home for self-defense, Charleston's limit is plainly reasonable and identical limits have survived intermediate scrutiny. *See Heller II*, 698 F. Supp. 2d at 189, 192 (upholding the limit based on evidence that such limits "are designed to reduce the number of guns entering the illegal market and to stem the flow of firearms between states" and "that handguns sold in multiple sales to the same individual purchaser are frequently used in crime") (internal quotation omitted).  Indeed, law enforcement

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

regards the purchase of multiple handguns by a single buyer in a single transaction as an indicator of gun trafficking, and in one year, handguns sold in multiple sales accounted for 20 percent of all handguns sold and traced. Bureau of Alcohol, Tobacco, and Firearms, *Crime Gun Trace Reports (2000) National Report* (July 2002), at 52. *See also* Mona Wright et al., "Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances That Suggest Trafficking," Journal of Urban Health: Bulletin of the New York Academy of Medicine, March 31, 2010 (handguns purchased in bulk were 33 percent more likely to be used in crime than handguns purchased one at a time); Douglas Weil & Rebecca Knox, "Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms," JAMA 275 (1996), at 1759-61 (Virginia's one handgun per month limit reduced by 66 percent the odds that a crime gun was purchased in Virginia relative to dealers elsewhere in the Southeast); Christopher Koper, Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun trafficking and Criminal Gun Use: Report to the National Institute of Justice, Philadelphia, PA: Jerry Lee School of Criminology (2007): 1-96 (Maryland one handgun per month law reduced risk of multiple-sale guns being recovered in crime).

Similarly, Plaintiffs claim that "no government may impose any mandatory waiting period" for the purchase of a gun, Complaint ¶ 97, but Plaintiffs again provide no legal authority and fail to explain how Charleston's 72-hour waiting period prevents effective self-defense in the home. Plaintiffs also fail to assert that the waiting period, which applies only in Charleston (and excludes sales at gun shows and exhibitions), prevents them from possessing guns in their homes for self-defense. Assuming the waiting period does implicate the Second Amendment, such a brief cooling off period is reasonable and also survives intermediate scrutiny. Charleston's waiting period allows law enforcement a reasonable amount of time to conduct a proper

background check, and. Charleston may have reasonably concluded that a short delay before allowing a person to acquire a handgun is necessary to implement *Heller's* "presumptively lawful" restrictions on dangerous persons acquiring firearms. Studies show that background check systems that allow law enforcement up to three days to complete a check have been successful in stopping criminals and other dangerous persons from getting guns. At the federal level, the Brady background check has blocked two million prohibited persons from obtaining firearms, and background checks performed at the local level have been even more successful. *See* 18 U.S.C. § 922(t) (providing law enforcement with up to three days to complete a background check); Michael Bowling et al., Dep't of Justice Bureau of Stastics, "Background Checks for Firearms Transfers, 2009-Statistical Tables" (Oct. 2010), *available at http://bjs.ojp.usdoj.gov/content/pub/html/bcft/2009/bcft09st.pdf*; S.A. Sumner et al., Firearm death rates and association with level of firearm purchase background check, 35 Am. J. Prev. Med. 1 (2008). These background checks have led to steep declines in gun homicide rates. *See* James M. La Valle, "Re-Estimating Gun-Policy Effects According to a National Science Academy Report: Were Previous Reports of Failure Pre-Mature?" *J.l of Crime& Justice*, 33(1) (2010); James M. La Valle, "Rebuilding at Gunpoint: A City-Level Re-Estimation of the Brady Law and the RTC Laws in the Wake of Hurricane Katrina," *Crim. Justice Pol'y Rev.* 18 (2007).

Lastly, even if Charleston's prohibition of sales of handguns to persons with a record does implicate the Second Amendment, it is reasonable and substantially related to the interest of public safety. Charleston defines "record" to include persons who have been either (1) convicted of a violent felony and not pardoned or currently indicted for a crime or (2) treated for mental health during the previous three years and not successfully cleared by the treating physician. Charleston City Code § 18-421. Similar, albeit somewhat narrower, regulations have already

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

been upheld following *Heller*. *See, e.g., Yancey*, 621 F.3d at 683-87 (upholding 18 U.S.C. § 922(g)(3), which prohibited illegal drug users from possession guns); *Skoien*, 614 F.3d at 642-45 (finding that 18 U.S.C. § 922(g)(9), which prohibits possession of guns by those convicted of misdemeanor crimes of domestic violence, survives intermediate scrutiny); *United States v. White*, 593 F.3d 1199, 1206 (11th Cir. 2010) (same); *Barton*, 633 F.3d at *1-4 (upholding 18 U.S.C. § 922(g)(1), which prohibited felons from possessing guns and ammunition); *Rozier*, 598 F.3d at 770-71 (same); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) (same); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir.), *cert. denied*, 131 S. Ct. 294 (2010) (same); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (same).  The same rationale supports the Cities' regulations.  *Heller*, and these cases, recognize that dangerous, irresponsible people do not have a constitutional right to possess guns.  Indeed, it is crucial to block dangerous people with records from getting guns, as studies show that those with arrest records who buy handguns are seven times more likely to be arrested after the handgun purchase than people with clean records.  Mona Wright and Garen Wintemute, *Felonious or Violent Criminal Activity That Prohibits Gun Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors*, J. of Trauma, Injury, Infection, & Critical Care (2010).  Similarly, a history of mental illness is a known risk factor for gun violence.  *See* R. Van Dorn et al., "Mental disorder and violence: is there a relationship beyond substance use?" Soc. Psychiatry Psychiatr. Epidemiol. (2011); S. Richard-Devantoy et al., "Risk of homicide and major mental disorders: a critical review," Encephale (2009).

That definition, which includes persons indicted for criminal conduct and persons who voluntarily sought treatment for mental illness, is a reasonable restriction to keep firearms away from dangerous people and those who are not responsible and law-abiding.  *See, e.g.*, 18 U.S.C.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

§ 922(n) (longstanding restriction on shipping, transporting, or receiving a gun by anyone indicted for a felony). In explaining that its decision in *Heller* did not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," the Supreme Court stressed that this list of "presumptively lawful regulatory measures" was not exhaustive, and that the Second Amendment right is limited to responsible, law-abiding persons. 554 U.S. at 626-27 & n.26.

## II. THE CONTESTED REGULATIONS DO NOT VIOLATE THE WEST VIRGINIA CONSTITUTION

### A. Like the Second Amendment, the Right To Guns Under the West Virginia Constitution Is Not Absolute and Reasonable Regulations of the Right Are Permissible.

West Virginia's highest court has repeatedly made clear that, like the Second Amendment, the right to keep and bear arms protected by West Virginia's Constitution is not absolute. *See Rohrbaugh*, 216 W. Va. at 307-08 (upholding statute that prohibited felons from possessing guns); *Perito v. County of Brooke*, 215 W. Va 178, 182 (2004) (same); *State v. Buckner*, 180 W. Va. 457, 463-64, 466-67 (1998) (striking statute that completely prohibited the carrying of guns without a license, but stressing that the court's holding "in no way means that the right of a person to bear arms is absolute"). Article III, section 22 of the West Virginia Constitution, as ratified on November 4, 1986, states in its entirety that, "A person has the right to keep and bear arms for the defense of self, family, home and state, and for lawful hunting and recreational use." W. Va. Const. Art. 3, § 22. But, "[t]he individual's right to keep and bear arms and the State's duty, under it [sic] police power, to make reasonable regulations for the purpose of protecting the health, safety and welfare of its citizens must be balanced." *Buckner*, 180 W. Va. at 467. As such, the legislature may, "through the valid exercise of its police power,

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

reasonably regulate the right of a person to keep and bear arms in order to promote the heath, safety and welfare of all citizens . . . , provided that the restrictions . . . do not frustrate the constitutional freedoms guaranteed by article III, section 22[.] *Id.*

**B.     The Contested Regulations Are Permissible Because They Are Reasonable and Do Not Frustrate the Guarantees of the West Virginia Constitution.**

The contested regulations are presumed to be constitutional, and it is Plaintiffs' heavy burden to rebut this presumption and prove beyond a reasonable doubt that the regulations are unconstitutional.  *See Rohrbaugh*, 216 W. Va. at 306; *Cole*, 665 Wis. 2d at 531.   Courts "accord[] great deference to the legislative process" underlying the enactment of regulations. *Rohrbaugh*, 216 W. Va. at 306.  And courts interpret regulations in any reasonable way which will sustain their constitutionally and resolve any doubt in favor of constitutionality.   *Id.* Plaintiffs cannot meet their heavy burden.

For the same reasons that the contested regulations survive both the reasonable regulation test and intermediate scrutiny, the regulations do not violate article III, section 22 of the West Virginia Constitution.  Each of the regulations are valid exercises of the Cities' inherent police power to regulate guns to promote the public safety.  And none of the regulations unreasonably frustrate the guarantees of the West Virginia Constitution.

**CONCLUSION**

For all the foregoing reasons, *amicus* the Brady Center respectfully requests that the Court find the contested regulations to be constitutional and dismiss with prejudice Plaintiffs' First Amended Complaint.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005

Dated: April 15, 2011                Respectfully submitted,


s/  Ashley French

Ashley W. French (WVSB #9060)
HUDDLESTON BOLEN LLP
707 Virginia Street East, Suite 1300
P.O. Box 3786
Charleston, WV 25337
(304) 344-9869
Counsel for *Amicus Curiae*

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE