UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


WEST VIRGINIA CITIZENS DEFENSE LEAGUE, INC.,
a West Virginia nonprofit corporation, and
KEITH T. MORGAN and
ELIZABETH L. MORGAN and
JEREOMY W. SCHULZ and
BENJAMIN L. ELLIS and
MASADA ENTERPRISES LLC,
a West Virginia limited liability company,

            Plaintiffs,

v.                                        Civil Action No. 2:11-0048

CITY OF CHARLESTON,
a West Virginia municipal corporation, and
DANNY JONES,
personally and in his official capacity
as the Mayor of the City of Charleston, and
BRENT WEBSTER,
personally and in his official capacity
as the Chief of Police of the City of Charleston, and
CITY OF SOUTH CHARLESTON,
a West Virginia municipal corporation, and
FRANK A. MULLENS, JR.,
in his official capacity as the
Mayor of the City of South Charleston, and
BRAD L. RINEHART,
in his official capacity as the
Chief of Police of the City of South Charleston, and
CITY OF DUNBAR,
a West Virginia municipal corporation, and
JACK YEAGER,
in his official capacity as the
Mayor of the City of Dunbar, and
EARL WHITTINGTON,
in his official capacity as the
Chief of Police of the City of Dunbar,

            Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

Pending are (1) the motion to dismiss filed March 28, 2011, by defendant City of Charleston, along with its Mayor Danny Jones and Chief of Police Brent Webster ("Charleston defendants"), (2) the motion to dismiss filed April 15, 2011, by defendant City of Dunbar, along with its Mayor Jack Yeager and Chief of Police Earl Whittington ("Dunbar defendants"), and (3) the motion to dismiss filed April 15, 2011, by defendant City of South Charleston, along with its Mayor Frank A. Mullens, Jr., and Chief of Police Brad L. Rinehart ("South Charleston defendants").

On May 16, 2011, the court received the final brief respecting these motions, namely, the reply by the Charleston defendants relating to their motion to dismiss.  On May 19, 2011, the court stayed the case at the parties' request pending disposition of the motions to dismiss.  On June 17, 2011, the court learned of a decision rendered by the Honorable John Preston Bailey, Chief Judge of the United States District Court for the Northern District of West Virginia, in the case of <u>West Virginia Citizens Defense League, Inc. v. City of Martinsburg</u>, No. 3:11-0005 (N.D. W. Va. Jan. 24, 2011).  Chief Judge Bailey requested briefing respecting the application of <u>Railroad Commission of Texas v. Pullman Co.</u>, 312 U.S. 496 (1941).  On

2

July 1, 2011, this court chose the same course.  Plaintiffs'
reply brief on the <u>Pullman</u> issue was received on August 11,
2011.  Chief Judge Bailey, as more fully discussed <u>infra</u>,
entered his decision to abstain and stay <u>City of Martinsburg</u>
pending adjudication by the state courts respecting certain
state claims alleged by plaintiffs.  On June 19, 2012, the court
of appeals affirmed the ruling.  <u>See</u> <u>West Virginia Citizens</u>
<u>Defense League, Inc. v. City of Martinsburg</u>, No. 11-2231, 2012
WL 2311837 (4th Cir. Jun 19, 2012).


I.


A.   The Parties


          Plaintiff West Virginia Citizens Defense League, Inc.
("WVCDL" or "the organization"), is a nonprofit corporation that
"support[s] an individual's right to keep and bear arms for
defense of self, family, home and state, and for lawful hunting
and recreational use, as protected by the West Virginia
Constitution and the Second Amendment of the United States
Constitution."  (Am. Compl. ¶ 2).  Some of WVCDL's members are
licensed to carry, and do carry, firearms for personal
protection when they visit the municipalities of Charleston,

Dunbar, and South Charleston.  The organization's membership also includes collectors who buy and sell handguns.

The defendant municipalities have each enacted ordinances that restrict or condition the possession and sale of firearms.  Violations are punishable by a fine and imprisonment for up to 30 days.  The individual plaintiffs are Keith T. Morgan, Elizabeth L. Morgan, Jereomy W. Schulz, and Benjamin L. Ellis.  Plaintiffs all reside in or near the defendant municipalities.  Mr. Ellis, a Charleston resident, is the organizer and sole member of plaintiff Masada Enterprises, LLC ("Masada"), a federally licensed firearms dealer in Elkview.

B.    Standing Claims Respecting the Charleston Defendants

The amended complaint and declarations filed by Mr. and Mrs. Morgan and Mr. Schulz contain a number of allegations designed to satisfy Article III standing requirements.  The amended complaint alleges that both Mr. Morgan and Mr. Schulz declined to purchase firearms from a Charleston dealer.  Their decision appears based upon Charleston's 72-hour waiting period and its prohibition on gun purchases within 30 days after having previously bought a firearm.

Mr. Morgan's declaration, which overlaps in many respects with similar filings by Mrs. Morgan and Mr. Schulz, elaborates further on the limitations he complains of and the concerns associated with them:

> 11. I regularly carry a handgun for personal protection at all times and places where I may lawfully do so. Only when a federal, state, or local law or regulation whose enforcement has not been enjoined by a court of competent jurisdiction prohibits carrying a handgun at a particular time or place do I not carry a handgun on my person.
>
> . . . .
>
> 17. On January 23, 2011, after I went to the Gander Mountain store located in the City of Charleston and identified, selected, and attempted to purchase a Kel-Tec P3AT pistol, an employee of Gander Mountain informed me that under Charleston City Code §§ 18-421 through 428, I was subject to a 72-hour waiting period, could not purchase the handgun if I had purchased any other handgun within the preceding 30 days, and would be required to complete a handgun purchase registration form prescribed by the City of Charleston and its chief of police, Brent Webster.
>
> 20. But for the requirements of Charleston City Code §§ 18-421 through 428, I would have completed my planned purchase.

(Aff. Of Keith Morgan at ¶¶ 11, 17, 20).  Mr. Morgan additionally asserts that if the challenged ordinances were stricken that he would purchase the aforementioned firearm.  He also states his belief that the Charleston defendants are presently enforcing the ordinances and specifically notes, by example, a prominent warning posted at the Charleston Civic Center respecting the ban on firearms.

Mr. Ellis and Masada also fear potential legal liability based upon the Charleston ordinances.  That concern is founded, at least in part, upon a definition found in section 18-421 of the City of Charleston Code:

> Dealer means any individual, corporation, partnership or venture which engages in any business, activity, trade or employment.

City of Chas. Code of Ords. § 18-421.  With respect to this and other language found in the Charleston ordinances, Mr. Ellis alleges as follows, presumably on behalf of Masada as well:

> Mr. Ellis cannot reasonably determine whether Charleston City Code §§ 18-421 through 428, referring to prohibiting various acts by any "person or dealer" or words to a similar effect, serve to regulate the transfer of handguns not only by licensed dealers, but also by literally any other person, including any resident of the City of Charleston who may attempt to sell, loan, or rent a handgun from his or her personal collection, either within or without the territorial limits of the City of Charleston, or any resident of the City of Charleston who may purchase or rent a handgun for any purpose within or without the territorial limits of the City of Charleston.

(Am. Compl. ¶ 57).  The court understands this allegation to form the basis for, inter alia, a vagueness challenge by both Mr. Ellis and Masada to the dealer requirements found in the Charleston ordinances.  That conclusion is supported by the allegations found in Count One, summarized later in this memorandum opinion and order.  One such dealer requirement is found in section 18-425 of the Charleston City Code:

6

> No person or dealer shall sell any handgun to any
> other person without first obtaining the following:
>
> > A registration form which shall include the
> > name and current residence address of the
> > purchaser; the name and address of the
> > seller shall be verified, signed and dated
> > by the purchaser and time-stamped by the
> > seller, and shall contain statements that
> > the handgun is for the use of the purchaser
> > and is not for resale within a 30-day
> > period, and the purchaser has not purchased
> > any other handgun within the 30-day period
> > immediately prior to the date on the
> > registration form.

City of Chas. Code of Ords. § 18-425.


C.  Standing Claims Respecting the South Charleston Defendants


        Mr. Schulz resides in the City of South Charleston.
He frequently visits Joplin Park.  He is prohibited by South
Charleston's ordinances from going there, or any other South
Charleston-owned location, however, while possessing a firearm.
Were it not for the South Charleston ordinances, Mr. Schulz, Mr.
and Mrs. Morgan, and Mr. Ellis, would "regularly carry handguns
when they visit various locations described" in the South
Charleston ordinances.  (Am. Compl. ¶ 205).  When Mr. and Mrs.
Morgan, Mr. Ellis, Mr. Schulz, and "many other" WVCDL members
occasionally visit these South Charleston-owned areas "while
exercising their constitutionally-protected right to keep and
bear arms for personal protection," they allege a reasonable

7

"fear [of] arrest, prosecution, fine, and imprisonment." (Id. ¶ 204).


D.    Standing Allegations Respecting the Dunbar Defendants


        With respect to the remaining defendants, Mr. Morgan asserts that Dunbar City Hall has posted warnings about the consequences of carrying of firearms therein, including a threat of "Criminal Prosecution." (Morgan Aff. At 3).  Mrs. Morgan, who works in Dunbar, notes that she has regularly in the past visited Dunbar Wine Cellar Park and the Dunbar Recreational Center.  She ceased doing so after she began regularly carrying a handgun.  She feared the penalties that might be imposed upon her as a result of the Dunbar ordinances that she and her fellow plaintiffs challenge.  Mr. Morgan expresses the same concern about "arrest, prosecution, fine, and imprisonment . . . while exercising [his] . . . right to keep and bear arms for personal protection" within Dunbar city limits.


E.    Claims Alleged Against Charleston Defendants


        Counts One through Thirty-Four are aimed at the Charleston defendants:


8

Count 1: Charleston's ordinances are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.[1]

Count 2: Charleston's ordinances are unconstitutionally vague in violation of the Due Process Clause of Article III, § 10 of the West Virginia Constitution

Count 3: Charleston's one handgun per month purchase limit violates the right of an individual to keep and bear arms under the Second and Fourteenth Amendments.

Count 4: Charleston's one handgun per month purchase limit violates the right of an individual to keep and bear arms under Article III, § 22 of the West Virginia Constitution.

Count 5: Charleston's one handgun per month purchase limit is unauthorized by state statute and invalid as a matter of state law.

Count 6: Charleston's 72-hour handgun purchase waiting period violates the right of an individual to keep and bear arms under the Second and Fourteenth Amendments.

---

[1] Count One, as noted _supra_, appears to be a challenge by Mr. Ellis and Masada to the scope of the Charleston ordinances respecting those who purchase and sell firearms:

> People of reasonable intelligence must necessarily guess whether Charleston City Code §§ 18-421 through 428, referring to prohibiting various acts by any "person or dealer" or words to a similar effect, serve to regulate the transfer of handguns not only by licensed dealers, but also by literally any other person, including any resident of the City of Charleston who may attempt to sell, loan, or rent a handgun from his or her personal collection, either within or without the territorial limits of the City of Charleston, <u>or any resident of the City of Charleston who may purchase or rent a handgun for any purpose within or without the territorial limits of the City of Charleston</u>.

(Am. Compl. ¶ 58 (emphasis added)).

Count 7: Charleston's 72-hour handgun purchase waiting period violates the right of an individual to keep and bear arms under Article III, § 22 of the West Virginia Constitution.

Count 8: Charleston's 72-hour handgun purchase waiting period is unauthorized by state statute and invalid as a matter of state law.

Count 9: Charleston's handgun registration requirement violates the right of an individual to keep and bear arms under the Second and Fourteenth Amendments.

Count 10: Charleston's handgun registration requirement violates the right of an individual to keep and bear arms under Article III, § 22 of the West Virginia Constitution.

Count 11: Charleston's handgun registration requirement is unauthorized by state statute and invalid as a matter of state law.

Count 12: Charleston's handgun registration form requires a  handgun purchaser to disclose his or her Social Security number in violation of section 7 of the Privacy Act of 1974 and 42 U.S.C. § 408

Count 13: Charleston's handgun registration form fails to inform a prospective handgun purchaser who is solicited to disclose his or her Social Security account number, whether the  disclosure of his or her Social Security number is mandatory or voluntary, in violation of section 7 of the Privacy Act of 1974.

Count 14: Charleston's handgun registration form fails to inform a prospective handgun purchaser who is solicited to disclose his or her Social Security account number, by what statutory or other authority such number is solicited, in violation of section 7 of the Privacy Act of 1974.

Count 15: Charleston's handgun registration form fails to inform a prospective handgun purchaser who is solicited to disclose his or her Social Security account number, what uses  will be made of the purchaser's Social Security account number, in violation of section 7 of the Privacy Act of 1974.

Count 16: Charleston's prohibition on carrying a weapon without a license violates the right of an

individual to keep and bear arms under the Second and Fourteenth Amendments.

Count 17: Charleston's prohibition on carrying a weapon without a license violates the right of an individual to keep and bear arms under Article III, §22 of the West Virginia Constitution.

Count 18: Charleston's prohibition on carrying a weapon without a license in the Sternwheel Regatta area violates the right of an individual to keep and bear arms under the Second and Fourteenth Amendments.

Count 19: Charleston's prohibition on carrying a weapon without a license in the Sternwheel Regatta area  violates the right of an individual to keep and bear arms under  Article III, § 22 of the West Virginia Constitution.

Count 20: Charleston's prohibition on carrying a weapon without a license in the Sternwheel Regatta area is unauthorized by state statute and invalid as a matter of state law.

Count 21: Charleston's prohibition on the purchase of a handgun by, or the sale of a handgun to, a purchaser who has received voluntary mental health treatment violates the right of an individual to keep and bear arms under the Second and Fourteenth Amendments

Count 22: Charleston's prohibition on the purchase of a handgun by, or the sale of a handgun to, a purchaser who has received voluntary mental health treatment violates the right of an individual to due process of law under the Fourteenth Amendment.

Count 23: Charleston's prohibition on the purchase of a handgun by, or the sale of a handgun to, a purchaser who has received voluntary mental health treatment violates Title II of the Americans With Disabilities Act and the Supremacy Clause.

Count 24: Charleston's prohibition on the purchase of a handgun by, or the sale of a handgun to, a purchaser who has received voluntary mental health treatment violates the right of an individual to keep and bear arms under Article III, § 22 of the West Virginia Constitution.

Count 25: Charleston's prohibition on the purchase of a handgun by, or the sale of a handgun to, a purchaser

who has received voluntary mental health treatment
violates the right of an individual to due process of
law under Article III, § 10 of the West Virginia
Constitution.

Count 26: Charleston's prohibition on the purchase of
a handgun by, or the sale of a handgun to, a purchaser
who has received voluntary mental health treatment is
unauthorized by state statute and invalid as a matter
of state law.

Count 27: Charleston's prohibition on the purchase of
a handgun by, or the sale of a handgun to, a purchaser
who has any criminal charges pending violates the
right of an individual to keep and bear arms under the
Second and Fourteenth Amendments.

Count 28: Charleston's prohibition on the purchase of
a handgun by, or the sale of a handgun to, a purchaser
who  has any criminal charges pending violates the
right of an individual to keep and bear arms under
Article III, § 22 of the West Virginia Constitution.

Count 29: Charleston's prohibition on the purchase of
a handgun by, or the sale of a handgun to, a purchaser
who has any criminal charges pending is unauthorized
by state statute and invalid as a matter of state law.

Count 30: Charleston's requirement that a prospective
handgun purchaser produce and display secondary
documentation of residence address within the last 90
days is unauthorized by state statute and invalid as a
matter of state law.

Count 31: Charleston's regulation of classes of
individuals lawfully permitted to purchase or be sold
handguns is unauthorized by state statute and invalid
as a matter of state law.

Count 32: Charleston's prohibition on carrying weapons
on city owned property violates the right of an
individual to keep and bear arms under the Second and
Fourteenth Amendments.

Count 33: Charleston's prohibition on carrying weapons
on city owned property violates the right of an
individual to keep and bear arms under Article III, §
22 of the West Virginia Constitution.

Count 34: Charleston's prohibition on carrying weapons on city owned property is unauthorized by state statute and invalid as a matter of state law.

F.  Claims Alleged Against South Charleston Defendants

Counts Thirty-Five and Thirty-Six are directed to the South Charleston defendants:

Count 35: South Charleston's prohibition on carrying weapons on city-owned property violates the right of an individual to keep and bear arms under the Second and Fourteenth Amendments.

Count 36: South Charleston's prohibition on carrying weapons on city-owned property violates the right of an individual to keep and bear arms under Article III, § 22 of the West Virginia Constitution.

G.  Claims Alleged Against Dunbar Defendants

Counts Thirty-Eight through Forty are directed to the Dunbar defendants:

Count 38: Dunbar's prohibition on carrying weapons on city owned property violates the right of an individual to keep and bear arms under the Second and Fourteenth Amendments.

Count 39: Dunbar's prohibition on carrying weapons on city owned property violates the right of an individual to keep and bear arms under Article III, § 22 of the West Virginia Constitution.

Count 40: Dunbar's prohibition on carrying weapons on city-owned property is unauthorized by state statute and invalid as a matter of state law.

13

H.    Relief Sought


        Plaintiffs seek preliminary and permanent injunctions enjoining defendants and their agents from enforcing the challenged ordinances, declaratory relief consistent with the requested injunction, and fees and costs.  Defendants assert that plaintiffs lack standing to pursue their challenges to the ordinances.  Those contentions are dealt with below.


                            II.

A.    Standing Challenges


                1. Governing Standard


        Article III of the Constitution limits the exercise of judicial power to "Cases" and "Controversies."  U.S. Const. art. III, § 1.  The provision reflects a desire to limit the Judiciary to "the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of the law."  Summers v. Earth Island Inst., 129 S. Ct. 1142, 1148 (2009); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 559–60 (1992); Cuccinelli v. Sebelius, 656 F.3d 253, 268 (4th

                            14

Cir. 2011)(noting that to allow otherwise "'would be inimical to the Constitution's democratic character'" and would weaken "'the public's confidence in . . . [a] restrained . . . Judiciary.'") (quoting <u>Arizona Christian School Tuition Org. v. Winn</u>, 131 S. Ct. 1436, 1442 (2011)).

Article III standing exists when a plaintiff alleges (1) an injury in fact, (2) a causal connection between that injury and the defendant's conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. <u>See</u> <u>Lujan</u>, 504 U.S. at 560-61. An "injury in fact" is one that "inva[des] . . . a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." <u>Id.</u> at 560 (internal quotation marks and citations omitted).

In cases, such as this one, where a preenforcement challenge to a criminal offense is at issue, a plaintiff must allege (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," and (2) "a credible threat of prosecution" under the law. <u>Babbitt v. United Farm Workers Nat'l Union</u>, 442 U.S. 289, 298 (1979). The threat must be real rather than imaginary or completely speculative. <u>See</u> <u>id.</u> at 298, 302; <u>see also</u> <u>Virginia Society for</u>

Human Life, Inc. v. Federal Election Com'n, 263 F.3d 379, 386
(4th Cir. 2001).

         The Supreme Court and our court of appeals have
likened the protections afforded under the First Amendment to
those existing under the Second Amendment. See United States v.
Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011) ("Indeed, as has
been the experience under the First Amendment, we might expect
that courts will employ different types of scrutiny in assessing
burdens on Second Amendment rights, depending on the character
of the Second Amendment question presented."); United States v.
Chester, 628 F.3d 673, 682 (4th Cir. 2010)(observing "Given
Heller's focus on 'core' Second Amendment conduct and the
Court's frequent references to First Amendment doctrine, we
agree with those who advocate looking to the First Amendment as
a guide in developing a standard of review for the Second
Amendment.") (quoting, in part, District of Columbia v. Heller,
554 U.S. 570, 596 (2008)). But see Chester, 628 F.3d at 685,
687 (Davis, J., concurring) ("I have concerns about the
majority's invitation to import First Amendment doctrines into
Second Amendment jurisprudence. . . . [Supreme Court precedent
on the point is] hardly an invitation to import the First
Amendment's idiosyncratic doctrines wholesale into a Second
Amendment context, where, without a link to expressive conduct,

16

they will often appear unjustified. To the extent some
commentators and courts, frustrated with Heller's lack of
guidance, have clung to these references and attempted to force
unwieldy First Amendment analogies, they muddle, rather than
clarify, analysis.").

That comparison between the First and Second Amendment
rights is of some moment here in light of the application of
standing principles to First Amendment challenges:

> A statute that "'facially restrict[s] expressive
> activity by the class to which the plaintiff belongs'
> presents such a credible threat," id. (quoting New
> Hampshire Right to Life PAC v. Gardner, 99 F.3d 8, 15
> (1st Cir. 1996)), particularly if it threatens to
> "chill the exercise of First Amendment rights," NCRL
> I, 168 F.3d at 710. Since the statutes challenged by
> the plaintiffs threaten to subject them to
> prosecution, and the plaintiffs are therefore
> "chilled" from engaging in potentially protected First
> Amendment political expression, standing exists in
> this case.

North Carolina Right to Life, Inc. v. Leake, 525 F.3d 274, 280
(4th Cir. 2008) (emphasis added); Virginia Society for Human
Life, Inc. v. Federal Election Com'n, 263 F.3d 379, 389 (4th
Cir. 2001) ("To establish standing for a preenforcement
challenge to a regulation, it is enough to 'allege[ ] an
intention to engage in a course of conduct arguably affected
with a constitutional interest, but proscribed by a
[regulation]. . . . At the time that VSHL filed suit, the 2000
election was only fifteen months away. VSHL's injury -- its fear

17

of prosecution -- was not only imminent but immediate because it needed to plan the substance and placement of its advertise- ments.'")(quoting <u>Babbitt v. United Farm Workers Nat'l Union</u>, 442 U.S. 289, 298 (1979)).

Irrespective of First Amendment analogies, plaintiffs seeking to challenge the constitutionality of state criminal provisions need not essentially put themselves in the dock. <u>See</u>, <u>e.g.</u>, <u>MedImmune, Inc. v. Genentech, Inc.</u>, 549 U.S. 118, 129 (2007) ("The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction."); <u>Mobil Oil Corp. v. Attorney General of Com. of Va.</u>, 940 F.2d 73, 75 (4th Cir. 1991) ("Public policy should encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power, all the while complying with the challenged law, rather than to deliberately break the law and take his chances in the ensuing suit or prosecution. . . . Mobil has certainly alleged 'an actual and well-founded fear' that the law will be enforced, and has in fact 'self-censored' itself by complying with the statute, incurring harm all the while."); <u>see also</u> <u>Free Enterprise Fund v. Public Co. Accounting Oversight Bd.</u>, 130 S. Ct. 3138, 3151 (2010)("We normally do not require

18

plaintiffs to 'bet the farm . . . by taking the violative action' before 'testing the validity of the law . . . .'") (citation omitted).

On a final note, once an individual member of an organizational plaintiff makes the necessary Article III showing, the organization will be deemed to have a sufficient stake based upon the doctrine of representational standing:

> [A]n association may have standing to sue in federal court either based on an injury to the organization in its own right or as the representative of its members who have been harmed.  An organization has representational standing when (1) at least one of its members would have standing to sue in his own right; (2) the organization seeks to protect interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit.

Friends of the Earth, Inc. v. Gaston Copper, 204 F.3d 149, 155 (4th Cir. 2000) (en banc) (citations omitted).


                    2. Charleston Defendants


        Mr. Morgan's declaration reflects that he is licensed to, and regularly does, carry a handgun for personal protection except when prohibited by law from doing so.  He also claims to have chosen not to purchase a firearm in 2011 based upon the registration, 72-hour waiting period, and 30-day restrictions found in the Charleston ordinances.  He would have consummated

his purchase were it not for the restrictions imposed by the Charleston ordinances.

He also perceives, it seems reasonably so, that he faces a threat of prosecution if he violates the ordinances. The threat is neither conjured nor speculative.  It is not a leap of the imagination to predict what would occur if law enforcement found any of the individual plaintiffs to have in his or her possession a firearm while visiting city hall or other city-owned properties.[2]  Neither Mr. Morgan, under the Charleston ordinances, nor his fellow plaintiffs, under the South Charleston and Dunbar laws, need suffer a confrontation with, and arrest by, law enforcement to have these matters taken up under Article III.  Inasmuch as the ordinances necessarily threaten prosecution, and the plaintiffs are restrained from engaging in potentially protected activity, the preenforcement nature of the claims is not an obstacle to the exercise of subject matter jurisdiction.

_____

[2] If the court concludes that no credible threat of prosecution exists, it all but invites the individual plaintiffs or others to enter city-owned property with a firearm in order to figuratively gain entry to the federal courthouse.  That approach is problematic for a variety of reasons, not the least of which includes public safety. It is noteworthy as well that one searches the municipalities' many pages of briefing in vain for even the slightest assurance "that plaintiffs will not be prosecuted if they do what they say they wish to do." Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2717 (2010).

The injury is the fear of prosecution and essentially forced compliance with the ordinances' prerequisites despite the allegation that they are unlawful.  These injuries, and the consequent impairment of the right to possess a firearm, are directly related to the passage and expected enforcement of the ordinances.  Finally, if the ordinances are declared unlawful the injury will be redressed promptly.  The allegations in Mr. Morgan's declaration satisfy the standing requirements associated with Counts One through Sixteen and Thirty through Thirty-Four.

It is also the case that both Mr. Ellis and Masada possess Article III standing based upon their Count One vagueness challenge to the Charleston ordinances.  They face uncertainty presently concerning their obligations to those Charleston residents seeking to purchase firearms from them outside city limits.  If a limiting construction is placed on the ordinances so as to bring clarity and certainty, the injury complained of will doubtless be redressed.

There are other counts of the complaint against the Charleston defendants, however, which appear unsupported by sufficient standing allegations.  Those deal with the prohibitions on (1) carrying a weapon without a license at the Sternwheel Regatta (an event, the court notes, that is no longer

conducted in Charleston), (2) the purchase of a handgun by, or the sale of a handgun to, one who has received voluntary mental health treatment, and (3) the purchase of a handgun by, or the sale of a handgun to, one who is the subject of pending criminal charges.  Plaintiffs have not directed the court to allegations in either the amended complaint or other materials in the record which would support the necessary personal stake of any of the plaintiffs in the adjudication of the issues raised by Counts Eighteen through Twenty-Nine.

The court, accordingly, ORDERS that the Charleston defendants' motion to dismiss be, and it hereby is, granted as to Counts Eighteen through Twenty-Nine and denied in all other respects.  Further, inasmuch as Mr. Morgan, a WVCDL member, possesses Article III standing, WVCDL does as well based upon the additional facts that it seeks to protect interests germane to its purposes.

### 3. South Charleston Defendants

Mr. Schulz is prohibited by South Charleston's ordinances from visiting Joplin Park, or locations owned by South Charleston, with a firearm.  He would carry one if the ordinances did not exist.  He too reasonably fears criminal sanctions if he violates the South Charleston ordinances.

Inasmuch as the two counts of the complaint directed at South Charleston challenge the prohibition on carrying firearms on city-owned property, Mr. Shulz' allegations plainly satisfy the Article III standing requirements.  The court, accordingly, ORDERS that the South Charleston defendants' motion to dismiss be, and it hereby is, denied.

### 4. Standing Challenge by Dunbar Defendants

Mrs. Morgan works in Dunbar and ceased visiting areas owned by that municipality once she began regularly carrying a firearm.  She feared the penalties that might be imposed upon her as a result of the Dunbar ordinances.  Mr. Morgan expresses the same concern about "arrest, prosecution, fine, and imprisonment . . . while exercising [his] . . . right to keep and bear arms for personal protection" within Dunbar city limits. (Morgan Aff. at 3). He notes in particular the posted warnings outside Dunbar City Hall concerning the carrying of firearms therein, including a threat of "Criminal Prosecution." (Id.).

Inasmuch as the three counts of the complaint directed at Dunbar challenge the prohibition on carrying firearms on city-owned property, Mr. and Mrs. Morgan's allegations plainly satisfy the Article III standing requirements.  The court,

23

accordingly, ORDERS that the Dunbar defendants' motion to dismiss be, and it hereby is, denied.[3]

B.    _Pullman_ Abstention

As noted, the court directed the filing of briefs respecting the application of the _Pullman_ abstention doctrine after having learned of a similar course taken by Chief Judge Bailey in the United States District Court for the Northern District of West Virginia.  Since the filing of plaintiffs' August 11, 2011, reply brief on that issue, Chief Judge Bailey entered a September 6, 2011, decision on the matter:

> For the reasons stated above, this Court will abstain from ruling on the issues presented by this case. This action will be stayed so that the plaintiff may present its state law issues to state court. . . . In the event that the state courts do not resolve this case under state law, the plaintiff will be permitted to seek a ruling on the federal issues in this Court.

_West Virginia Citizens Defense League, Inc. v. City of Martinsburg_, No. 3:11-0005, slip op. at 7 (N.D. W. Va. Sept. 6, 2011).  As noted, the court of appeals affirmed.

_____

[3] Some or all of the defendants also seek dismissal on alternative or partial grounds.  For instance, all defendants assert that the municipalities were authorized by state law to enact the challenged ordinances.  Additionally, the South Charleston and Dunbar defendants assert that the measures offend neither the federal or state constitutions.  The court does not reach the assertions at this time in view of the ultimate disposition found in the next section of this memorandum opinion and order.

Controlling precedent makes clear that abstention is "the exception, not the rule." New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 359 (1989) (internal quotation marks omitted). There are nevertheless "carefully defined . . . areas in which . . . abstention is permissible." Id. at 359 (internal quotation marks omitted); MLC Automotive, LLC v. Town of Southern Pines, 532 F.3d 269, 280 (4th Cir. 2008). One such area involves deferral to a state tribunal on unsettled state law issues that might obviate the need to reach federal constitutional claims. See Meredith v. Talbot County, 828 F.2d 228, 231 (4th Cir. 1987) (noting that "Pullman abstention is appropriate where there are unsettled questions of state law that may dispose of the case and avoid the need for deciding the constitutional question."). Stated a slightly different way, Pullman abstention focuses on whether "there is (1) an unclear issue of state law presented for decision (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that the state law issue is 'potentially dispositive.'" Educational Servs., Inc. v. Maryland State Bd. for Higher Educ., 710 F.2d 170, 174 (4th Cir. 1983) (quoted authority omitted); see also Donohoe Constr. Co., Inc. v. Montgomery Cnty. Coun., 567 F.2d 603, 607 (4th Cir. 1977).

Article III, section 22 of the West Virginia Constitution provides as follows:

> A person has the right to keep and bear arms for the defense of self, family, home and state, and for lawful hunting and recreational use.

W. Va. Const. Art. 3, § 22.  The Supreme Court of Appeals of West Virginia has not had occasion to address whether the ordinances at issue here transgress this constitutional privilege.  The outcome is difficult to predict inasmuch as a flexible, means-ends inquiry governs the analysis:

> "The West Virginia legislature may, through the valid exercise of its police power, reasonably regulate the right of a person to keep and bear arms in order to promote the health, safety and welfare of all citizens of this State, provided that the restrictions or regulations imposed do not frustrate the constitutional freedoms guaranteed by article III, section 22 of the West Virginia Constitution, known as the 'Right to Keep and Bear Arms Amendment.'"

Syl. Pt. 3, Hartley Hill Hunt Club v. County Com'n of Ritchie County, 220 W. Va. 382, 384, 647 S.E.2d 818, 820 (2007)(quoting Syl. Pt. 4, State ex rel. City of Princeton v. Buckner, 180 W.Va. 457, 458, 377 S.E.2d 139, 140 (1988)).  It is thus unclear how the supreme court of appeals might adjudicate the state constitutional questions.

Further, upon considering the ordinances, the supreme court of appeals may uphold or invalidate one or more of those provisions.  The state high court's potentially dispositive

26

resolution may thus moot or present in a different posture the federal constitutional issues.

Two other considerations merit mention as well. First, Chief Judge Bailey's September 6, 2011, ruling means that plaintiffs there may seek an authoritative determination of the state constitutional issues in a state circuit court. So, too, may the plaintiffs here. It would be inadvisable to render in this court a determination of uncertain state law when those state issues may in the meantime be under consideration, and perhaps resolved, by a state tribunal. That is especially so when the matter involves a matter of public policy so important as the permissible scope of municipal firearm restrictions under the state constitution.

Second, abstention best serves the recent observation of our court of appeals counseling restraint in ascertaining the reach of <u>Heller</u> and its progeny:

> There simply is no need in this litigation to break ground that our superiors have not tread. To the degree that we push the right beyond what the Supreme Court in <u>Heller</u> declared to be its origin, we circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts we cannot foresee. This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights. It is not far-fetched to think the <u>Heller</u> Court wished to leave open the possibility that such a danger would rise

27

exponentially as one moved the right from the home to the public square.

If ever there was an occasion for restraint, this would seem to be it. There is much to be said for a course of simple caution.

United States v. Masciandaro, 638 F.3d 458, 475-76 (4th Cir. 2011).

Plaintiffs assert that "state law is sufficiently clear and not fairly open to interpretation." (Pls.' Resp. and Objecs. at 2). They curiously focus only on the state statutory authority of the municipalities to enact the ordinances. They make only one nonsubstantive mention of Article III, section 22, in their opening brief, relegating it to a footnote. Plaintiffs also express their preference that the court certify questions to the supreme court of appeals instead of abstaining. Inasmuch as an evidentiary record will doubtless need to be developed, certification is inappropriate. Plaintiffs appear to concede as much. (Id. at 10 ("certifying questions involving the constitutionality of the challenged ordinances to the West Virginia Supreme Court of Appeals at this particular time, before all the relevant facts are determined, would likely present nonjusticiable, academic, hypothetical questions well outside the bounds of the courts' [sic] respective jurisdiction.").

Defendants oppose abstention as well, on essentially two grounds.  First, they assert that the standard for constitutional review applicable to Article III, section 22, is clear enough.  That is true.  The application of that flexible standard to the challenged ordinances, however, is a novel question, the answer to which may change the complexion of this action or obviate the need to pursue it altogether.  Second, defendants assert that the Second Amendment and Article III, section 22 are substantively close enough to one another that they might be considered parallel provisions for which abstention would be inappropriate.  That is plainly not the case.  The state provision is far more explicit than its federal counterpart.  This is not a situation where two similarly drafted federal and state due process or speech provisions are at issue.  Mirror provisions are not here involved.

The court, accordingly, abstains from further adjudication of the parties' rights at this time.[4]  It is ORDERED

---

[4] The court of appeals in <u>City of Martinsburg</u> concluded the same approach was appropriate:

In this case, WVCDL's assertion that the record is bereft of evidence demonstrating the presence of thorny and potentially dispositive state law questions is without merit, given that WVCDL's complaint squarely demonstrates the presence of numerous such issues. Nor do we countenance WVCDL's contention that <u>Arizonans for Official English v. Arizona</u>, 520 U.S. 43, 75–80 (1997), renders the district court's reliance on <u>Pullman</u>

(continued…)

that this action be, and it hereby is, stayed to permit plaintiffs to present their state law claims to a state court of competent jurisdiction.  In the event that the state courts do not resolve the parties' dispute on state law grounds, plaintiffs are given leave to return to this court for adjudication of their federal claims.

---

improper. In our view, the circumstances of this case would have supported either certifying a question of state law to the West Virginia state courts or invoking the Pullman abstention doctrine. Because both options were equally available to the district court, it was not an abuse of discretion for the court to choose the latter over the former.

City of Martinsburg, 2012 WL 2311837, at *2.

III.

Based upon the foregoing discussion, it is ORDERED as follows:

1. That the Charleston defendants' motion to dismiss be, and it hereby is, granted as to Counts Eighteen through Twenty-Nine and denied in all other respects;

2. That the South Charleston and Dunbar defendants' motions to dismiss be, and they hereby are, denied;

3. That this action be, and it hereby is, stayed and retired to the inactive docket to permit plaintiffs to present their state law claims to a state court of competent jurisdiction;

4. That the defendants be, and they hereby are, given leave to delay the filing of their respective answers to the amended complaint pending the further order of the court following the lifting of the stay; and

5. That, in the event that the state courts do not resolve the parties' dispute on state law grounds, plaintiffs be, and they hereby are, given leave to return to this court for adjudication of their federal claims.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.  The Clerk is further directed to send a copy to the following entities at the addresses indicated:

WVCDL
P.O. Box 11371
Charleston, WV, 25339-1371,
Via certified mail, return receipt requested

Masada Enterprises LLC
501 Mountview Drive
Elkview, WV, 25071
Via certified mail, return receipt requested

Benjamin Ellis
1101 Shamrock Road
Charleston, WV, 25314
Via certified mail, return receipt requested

Keith Morgan, WVCDL President
kmorgan@wvcdl.org

Leonard Roman, WVCDL Vice President
lroman@wvcdl.org.

WVCDL, Masada Enterprises LLC, Mr. Ellis, Mr. Morgan and Mr. Roman are additionally deemed jointly responsible for providing a copy of this written opinion and order to their

fellow plaintiffs, Ms. Elizabeth L. Morgan and Mr. Jereomy W. Schulz.[5]

DATED:  September 20, 2012

John T. Copenhaver, Jr.
United States District Judge

---

[5] The unusual method for providing notice of the court's ruling is necessitated by the untimely death on August 22, 2012, of plaintiffs' counsel and the nonappearance of substitute counsel since that time.